STATE OF MINNESOTA

IN SUPREME COURT

A14-1452

Pope County                                                    Dietzen, J.
                                              Took no part, Hudson, J.

State of Minnesota,

                    Respondent,

vs.                                               Filed:  February 10, 2016
                                                  Office of Appellate Courts

Amanda Lea Peltier,

                    Appellant.

_____

Lori Swanson, Attorney General, Michael T. Everson, Assistant Attorney General, Saint Paul, Minnesota; and

Neil Nelson, Pope County Attorney, Glenwood, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Rochelle R. Winn, Assistant Appellate Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The instruction given to the jury describing the elements of first-degree child abuse murder, Minn. Stat. § 609.185(a)(5) (2014), including malicious punishment of a child as a type of child abuse, constituted plain error because the instruction failed to include the elements of malicious punishment of a child under Minn. Stat. § 609.377, subd. 1 (2014).  The appellant, however, failed to establish that the erroneous jury instruction affected her substantial rights.

1

2.     The district court did not err in admitting expert testimony that commented on the form of abuse because there was no reasonable likelihood that testimony significantly affected the verdict.

3.     The prosecutor made several remarks that were improper, but those remarks did not affect the defendant's substantial rights.

Affirmed.

O P I N I O N

DIETZEN, Justice.

Appellant Amanda Lea Peltier was found guilty by a Pope County jury of first-degree murder while committing child abuse, second-degree felony murder, and second-degree manslaughter, arising out of the death of Eric D. on February 28, 2013. The district court convicted Peltier of first-degree murder while committing child abuse and imposed a life sentence with the possibility of supervised release after 30 years. On direct appeal Peltier argues: (1) the jury instruction omitted essential elements of the charged offense, denying her a fair trial; (2) the district court abused its discretion in allowing a state expert to testify that biting a child is a "particularly vicious" form of child abuse; and (3) the prosecutor engaged in misconduct during closing argument that deprived Peltier of a fair trial. For the reasons that follow, we affirm the conviction.

On the evening of February 27, 2013, police responded to a 911 call from Peltier's home that her stepson, four-year-old Eric, was unresponsive. Upon arrival, an emergency

medical technician immediately administered CPR[1] and transported Eric to the local hospital. The child was intubated with a ventilator to assist his breathing, and a nasogastric tube was inserted into his stomach to help stabilize him. Subsequently, Eric was transported by helicopter to St. Cloud Hospital, where he died after medical efforts to save his life proved unsuccessful.

Dr. Michael McGee performed an autopsy on Eric's body that revealed a series of four crescent-shaped injuries on Eric's scalp, as well as swelling of the soft tissue of the scalp. These injuries were consistent with an adult biting Eric's head 2 to 3 days prior to his death. The child's body had 11 separate bruises on the forehead, including two that could have been caused by an object striking Eric. Also, his body had a significant injury to the lips, a hemorrhage on the left ear, and inner-ear injuries to the right ear.

Dr. McGee concluded that the cause of death was peritonitis, which was the result of a perforated bowel. Peritonitis occurs when bacteria are released into the abdominal cavity, producing an inflammatory response. Dr. McGee concluded that the perforation of the bowel probably occurred within three days before Eric's death and was the result of blunt force trauma to Eric's abdomen.

Peltier was questioned about the events leading up to Eric's death by investigators from the Minnesota Bureau of Criminal Apprehension (BCA) on February 28 and March 5, 2013. She told them that on Tuesday, February 26, after leaving Eric on the couch, she heard him scream and returned to find his lip bleeding. Peltier said that Eric began

---

[1] "CPR" is an abbreviation for cardiopulmonary resuscitation.

vomiting around 1:30 p.m. that day, and that he continued vomiting all afternoon and into the evening. Eric also complained of pain in his stomach and back.

Peltier told the BCA investigators that Eric's illness persisted into Wednesday, February 27, and that he started taking "short, quick" breaths at about 7:30 p.m. He also had a slight fever at that time. Peltier stated that she brought Eric into her bed to keep an eye on him, that he appeared confused, and that he repeatedly tried to drink out of his "puke bucket." Peltier left Eric in the bedroom and went to prepare a place for him to sleep on the couch. When Peltier returned, Eric was on his back, choking on his own vomit. Peltier began performing CPR, and Eric's father, D.D., called 911.

Following an investigation, the matter was submitted to a grand jury. The grand jury returned an indictment charging Peltier with murder in the first degree while committing child abuse, Minn. Stat. § 609.185(a)(5) (2014), and murder in the second degree while committing malicious punishment of a child, Minn. Stat. §§ 609.19, subd. 2(1) (2014), 609.377, subd. 6 (2014).

At trial, the State presented extensive testimony in support of its theory that Peltier caused the death of her stepson, Eric, while committing child abuse. The State introduced the results of Dr. McGee's autopsy and the recordings of two interviews of Peltier by state investigators. During one of the interviews, Peltier admitted to slapping Eric on the mouth or the side of his head "a good 6 to 10 times" in the 2 days preceding his death. Additionally, the staff at the daycare that Eric attended from December 2010 through January 2012 testified that Eric appeared to be physically abused. Also, Dr. James Green, an orthopedic surgeon, testified that Eric suffered a broken arm while in Peltier's care.

4

Finally, Peltier's neighbor, T.C., testified that, on the Saturday following Eric's death, Peltier told her that she was going to "go down for" Eric's death.

Following trial, a Pope County jury found Peltier guilty of first-degree murder while committing child abuse, second-degree murder while committing malicious punishment of a child, and the lesser-included offense of second-degree manslaughter. The district court imposed a life sentence with eligibility for supervised release after 30 years. This direct appeal followed.

I.

Peltier first argues that the district court erred when it instructed the jury on the definition of first-degree murder while committing child abuse under Minn. Stat. § 609.185(a)(5), and that the error denied her a fair trial. Specifically, Peltier contends that the jury instructions omitted essential elements of the charged offense that allowed the jury to find her guilty without finding that the State proved all the elements of the crime. The State responds that Peltier failed to raise this argument below, and therefore it is subject to plain-error review. Also, the State maintains that the district court did not err because it properly instructed the jury on all the elements of first-degree child-abuse murder.

We review a district court's jury instructions for an abuse of discretion. *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007). The district court enjoys considerable latitude in selecting jury instructions, including the specific language of those instructions. *See State v. Kelley*, 855 N.W.2d 269, 274 (Minn. 2014). But the jury instructions must fairly and adequately explain the law of the case and not materially misstate the law. *State v. Carridine*, 812 N.W.2d 130, 142 (Minn. 2012); *State v. Kuhnau*, 622 N.W.2d 552, 556

(Minn. 2001). For example, a district court commits plain error if it fails to properly instruct the jury on all elements of the offense charged. *See State v. Vance*, 734 N.W.2d 650, 658 (Minn. 2007) (explaining *State v. Ihle*, 640 N.W.2d 910, 912-17 (Minn. 2002)); *Mahkuk*, 736 N.W.2d at 682. We review the jury instructions as a whole to determine whether they fairly and adequately explain the law. *Kelley*, 855 N.W.2d at 274.

Peltier was convicted of first-degree murder while committing child abuse. Minn. Stat. § 609.185(a)(5); Minn. Stat. § 609.377. A person is guilty of this type of first-degree murder if she:

> causes the death of a minor while committing child abuse, when the perpetrator has engaged in a past pattern of child abuse upon a child and the death occurs under circumstances manifesting an extreme indifference to human life.

Minn. Stat. § 609.185(a)(5). Under this statute, "child abuse" is defined as "an act committed against a minor victim that constitutes a violation" of any one of twelve enumerated statutes. Minn. Stat. § 609.185(d) (2014). The district court in this case instructed the jury that "child abuse" includes first-degree assault, Minn. Stat. § 609.221 (2014); third-degree assault, Minn. Stat. § 609.223 (2014); fifth-degree assault, Minn. Stat. § 609.224 (2014); malicious punishment of a child, Minn. Stat. § 609.377; and neglect of a child, Minn. Stat. § 609.378 (2014). At issue in the present appeal are the district court's instructions to the jury with respect to malicious punishment of a child.

Malicious punishment of a child is defined, in relevant part, as "an intentional act or a series of intentional acts with respect to a child," committed by "[a] parent, legal guardian, or caretaker," that "evidences unreasonable force or cruel discipline that is

6

excessive under the circumstances." Minn. Stat. § 609.377, subd. 1. Malicious punishment is either a gross misdemeanor or a felony, depending upon the offender's record of prior offenses, the nature and extent of any injury inflicted, and the age of the child. *Id.*, subds. 2-6. Section 609.377, subdivision 4, provides that malicious punishment is a felony when "the punishment is to a child under the age of four and causes bodily harm to the head, eyes, neck, or otherwise causes multiple bruises to the body." *Id.*, subd. 4.

The district court's jury instructions on the elements of first-degree murder while committing child abuse addressed malicious punishment twice.[2] The court first discussed malicious punishment as part of its instruction on the "child abuse" element. It identified, and defined, each of the five forms of child abuse that were alleged by the State: first-, third-, and fifth-degree assault; malicious punishment of a child; and child neglect. With respect to malicious punishment, the court gave each of the three elements: (1) "parent, legal guardian, or caretaker"; (2) "intentional act or series of intentional acts with respect to a child"; and (3) "evidences unreasonable force or cruel discipline that is excessive under the circumstances." The court defined the terms "unreasonable force," "cruelty," and "caretaker." Finally, the court advised the jury that a person is not guilty of malicious punishment if the person has used "reasonable force" to "restrain or correct" a child.

---

[2]     The district court also set forth the elements of malicious punishment of a child in its instruction for second-degree murder while committing malicious punishment of a child.

7

The court addressed malicious punishment a second time, as part of its instructions on the "past pattern of child abuse" element. The court's instructions included the following relevant language:

> [T]he defendant engaged in a past pattern of child abuse upon [Eric]. A "past pattern" consists of prior acts of child abuse which form a reliable sample of observable traits or acts which characterize an individual's behavior. More than one prior act of child abuse is required for there to be a past pattern.
>
> For the purpose of determining a past pattern of child abuse you can consider all the crimes described in subparagraphs A-E under element number three above, as well as these additional definitions of third degree assault and malicious punishment of a child:
>
> . . . .
>
> *Malicious punishment can also be committed when the punishment is to a child under the age of four and causes bodily harm to the head, eye, neck, or otherwise causes multiple bruises to the body of the child.*

(Emphasis added.)

Peltier contends that the italicized language relating to felony malicious punishment of a child under Minn. Stat. § 609.377, subd. 4, misstated the law because it omitted the elements of malicious punishment that are set forth in Minn. Stat. § 609.377, subd. 1. The two factors contained in the instruction—the child's age and the nature or location of any injury inflicted—are not themselves elements of the crime; instead they are circumstances that, when present, will elevate the conduct to a felony offense under Minn. Stat. § 609.377, subd. 4. Peltier asserts that the omission of the actual offense elements allowed the jury to find that she committed malicious punishment of a child without finding that her conduct was intentional, or that her conduct evidenced unreasonable force or cruel discipline that was excessive under the circumstances.

8

Initially, we must determine whether Peltier preserved her jury instruction omission claim for appeal. The record reflects that, while Peltier objected to portions of the court's proposed jury instructions, she did so on grounds unrelated to those she raises in this appeal. Peltier objected to the court's first-degree-murder instruction as a whole on the ground that it was "cumbersome, burdensome, and confusing." She pointed specifically to the court's use of the phrase "other *serious* bodily harm," in lieu of the phrase "other *great* bodily harm," when defining first-degree assault. Peltier also argued, with respect to the instruction on malicious punishment of a child, that it would confuse the jury because Eric was more than 4 years old at the time of his death. Peltier also objected on the ground that the phrase, "under circumstances that manifested an extreme indifference to human life," was vague. The district court overruled all of these objections.

Because Peltier did not raise the objection in the district court that she now raises on appeal, her jury instruction omission claim is subject to plain-error analysis. *See State v. Watkins*, 840 N.W.2d 21, 27-28 (Minn. 2013) (citing *State v. Milton*, 821 N.W.2d 789, 808-10 & n.14 (Minn. 2012) (applying plain-error analysis to determine whether a failure to instruct the jury on the intent element of accomplice liability affected the defendant's substantial rights); *State v. Baird*, 654 N.W.2d 105, 113 (Minn. 2002) (concluding that plain-error analysis is applicable to unobjected-to erroneous jury instruction)).

Under plain-error analysis, Peltier is required to establish (1) an error, (2) that is plain, and (3) that affects her substantial rights. *Id.* at 28 (citing *State v. Griller,* 583 N.W.2d 736, 740 (Minn. 1998)). If all three of these requirements are met, we then assess whether reversal is required to ensure "the fairness, integrity, or public reputation of

9

judicial proceedings." *State v. Scruggs*, 822 N.W.2d 631, 642 (Minn. 2012) (citation omitted) (internal quotation marks omitted); *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn. 2001) (citing *Johnson v. United States*, 520 U.S. 461, 467 (1997)). An error is "plain" if it is clear or obvious. *State v. Cao*, 788 N.W.2d 710, 715 (Minn. 2010). Typically, a "plain" error contravenes case law, a rule, or a standard of conduct. *Id.*

The instruction in this case properly instructed the jury that felony malicious punishment of a child under Minn. Stat. § 609.377, subd. 4, is a crime that may constitute a past pattern of child abuse under Minn. Stat. § 609.185(a)(5). But the jury instruction omitted the offense elements of the crime of malicious punishment of a child: that the conduct involved "an intentional act or series of intentional acts" that "evidences unreasonable force or cruel discipline that is excessive under the circumstances." Minn. Stat. § 609.377, subd. 1. Because the jury instruction describing felony malicious punishment of a child under Minn. Stat. § 609.377, subd. 4 as a type of child abuse omitted the elements of the offense set forth in Minn. Stat. § 609.377, subd. 1, the instruction was plainly erroneous.

We next examine whether Peltier has established that the plain error affected her substantial rights. *See Watkins*, 840 N.W.2d at 28 (reaffirming "that the omission of an element of a crime in a jury instruction does not automatically require a new trial"). "An error in instructing the jury is prejudicial if there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury's verdict." *Id.* (quoting *State v. Gomez*, 721 N.W.2d 871, 880 (Minn. 2006)).

10

To determine whether this error affected Peltier's substantial rights, we look to all relevant factors including, but not limited to: (1) whether Peltier contested the omitted elements at trial and submitted evidence to support a contrary finding; (2) whether the State presented overwhelming evidence to prove those elements; and (3) whether the jury's verdict nonetheless encompassed a finding on those elements notwithstanding their omission from the jury instructions. *Watkins*, 840 N.W.2d at 29. We will examine these three factors in turn.

As to the first factor, Peltier does not contest that her physical abuse of Eric was intentional and excessive. Indeed, she admitted that she physically abused Eric. Peltier's neighbor, T.C., testified that Peltier admitted that she threw Eric into a corner a short time before his death, and that Peltier "hit him in the face and buttocks," leaving bruises. Peltier also admitted that she had bitten Eric on the head. Peltier's seven-year-old son, J.P., testified that he saw Peltier choke, bite, and throw Eric. Peltier also admitted to State investigators that she slapped Eric on the mouth and the side of his head "a good 6 to 10 times" in the 2 days leading up to his death. Peltier admitted to biting Eric on his head and face, and that she grabbed Eric by the arm and threw him into the wall. Peltier attempted to deflect some of the blame to Eric, but not once did Peltier argue to the jury that her acts were unintentional or reasonable rather than cruel and excessive under the circumstances.

As to the second factor, the evidence that the physical abuse was intentional and excessive is overwhelming. In addition to Peltier's admissions, employees at the daycare Eric attended from December 2010 until January 2012 testified that Peltier treated Eric harshly, and did not show him warmth or affection. Peltier frequently complained to them

11

about Eric's behavior, spoke angrily to him, and sometimes asked daycare staff to make Eric spend the day by himself at a table if he had misbehaved the previous evening. The staff noticed that Eric often had bruises, scratches, and bite marks on his body, and that the number and frequency of these injuries was unusually high compared to other children. In late October 2011, Eric arrived at daycare with multiple bite marks on his cheek and ear. He also had bruises and scratches on his body. In mid-November 2011, Eric had a large bump on his head, surrounded by puncture wounds. When asked about the injury, Eric responded first by blaming his brother, but later said that Peltier was responsible. A daycare provider subsequently filed a report with child protection.

Dr. James Green, an orthopedic surgeon, testified that he had previously treated Eric for a broken arm. Dr. Green determined that Eric had a spiral fracture of his right humerus and noted a developing black eye. Because spiral fractures are rare in young children and often indicate abuse, the injury was reported to child protection. A witness from Pope County Social Services, K.L.T., who investigated Eric's broken arm, testified that Peltier told her Eric sustained the injury after falling down the stairs. After consulting with a different doctor, K.L.T. decided not to pursue the matter.

Peltier subsequently removed Eric from the daycare provider and placed him in C.M.'s in-home daycare. C.M. testified she noticed bruising and bite marks on Eric within days of his placement with her. M.D., who provided special education services to Eric at the daycare, testified Eric told her the bite marks on his face were self-inflicted. M.D. took photos of the marks and filed a report with child protection in January 2012.

12

K.L.T. testified that she met with Eric twice in 2012, and that his demeanor changed between the meetings. At the first meeting, Eric was interactive, but at the second visit, Eric was withdrawn, would not make eye contact, and "looked very sad." When asked by K.L.T., Peltier denied that she physically disciplined her children. Instead, Peltier suggested that Eric had vision problems that made him clumsy and that he bruised easily. During a subsequent examination, doctors determined that Eric had no major vision problems and that there was nothing abnormal about his propensity to bruise.

Taken together, this evidence overwhelmingly demonstrates that Peltier engaged in a pattern of malicious punishment of Eric prior to his death. Contrary to Peltier's assertions on appeal, the conduct on display here does not present a close call.

As to the third factor in the *Watkins* prejudice analysis, we agree with Peltier that the jury's verdict did not otherwise encompass a finding that the abuse was intentional and excessive under the circumstances.[3] *See* Minn. Stat. § 609.377, subd. 1. Thus, this factor favors Peltier.

The *Watkins* factors are not exclusive, do not comprise a rigid test, and it does not necessarily follow that each must be satisfied. *See* 840 N.W.2d at 29. We observe that this is not a case in which the jury was *never* instructed on the essential elements of malicious punishment of a child. In fact, as discussed above, the district court's instructions on "child

---

[3]      The jury's verdict on count two, second-degree murder while committing malicious punishment of a child, reflects the jury's conclusion that Peltier committed malicious punishment of a child when she killed Eric. However, the jury's determination that Peltier engaged in malicious punishment of a child on this one occasion is insufficient to find a *past pattern* of child abuse under Minn. Stat. § 609.185(a)(5).

abuse" included all of the statutory elements of malicious punishment of a child, as did its instruction on second-degree murder while committing malicious punishment of a child. While these portions of the instructions were not sufficient to cure the court's error, they do inform our conclusion as to the nature and extent of any prejudice.

We conclude the instruction given to the jury describing the elements of first-degree child abuse murder, Minn. Stat. § 609.185(a)(5), including malicious punishment of a child as a type of child abuse, constituted plain error because the instruction failed to include the elements of malicious punishment of a child under Minn. Stat. § 609.377, subd. 1. The appellant, however, failed to establish that the erroneous jury instruction affected her substantial rights. While it is true in this case that the jury's verdict did not otherwise encompass a finding on the omitted elements, that factor is greatly outweighed by Peltier's failure to contest the omitted elements of malicious punishment of a child and the State's presentation of overwhelming evidence to prove those elements.

II.

Peltier next argues the district court abused its discretion in permitting Dr. Mark Hudson, a pediatrician specializing in child abuse at Children's Hospital and Clinics of Minnesota, to offer his expert opinion that biting constitutes a "particularly vicious" form of child abuse. She contends the testimony should have been excluded because it was of low probative value, inflammatory, and not helpful to the jury.

We review the district court's evidentiary rulings for an abuse of discretion. *Mahkuk*, 736 N.W.2d at 686. Peltier bears the burden of demonstrating both that the district court abused its discretion in admitting the evidence at issue here, and that she was

14

prejudiced by its admission. *State v. Sanders*, 775 N.W.2d 883, 887 (Minn. 2009). Peltier made a timely objection to Dr. Hudson's testimony, and therefore the harmless-error standard applies. *Id.* Under the harmless-error standard, an appellant who alleges an error in the admission of evidence that does not implicate a constitutional right must prove that there is "a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Matthews*, 800 N.W.2d 629, 633 (Minn. 2011) (citation omitted) (internal quotation marks omitted). We look to the following factors when determining whether testimony significantly affected a verdict: (1) the manner in which the State presented the testimony; (2) whether the testimony was highly persuasive; (3) whether the State used the testimony in closing argument; and (4) whether the defense effectively countered the testimony. *Id.* at 634.

An expert witness is permitted to testify in the form of an opinion when: (1) the testimony will assist the factfinder; (2) the witness is qualified to provide expert testimony because of his knowledge, skill, experience, training, or education; and (3) the expert's opinion has foundational reliability. Minn. R. Evid. 702; *Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 164-65 (Minn. 2012). Opinion testimony is not objectionable merely because it embraces an ultimate issue to be decided by the jury. Minn. R. Evid. 704. In exercising its discretion, the district court must examine whether the expert is qualified to express an opinion, and whether the opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. "Expert testimony may be excluded if its probative value is substantially outweighed by the danger of unfair

15

prejudice, confusion, or misleading the jury." *State v. Sontoya*, 788 N.W.2d 868, 872-73 (Minn. 2010).

The relevant portion of Dr. Hudson's testimony was as follows:

PROSECUTOR: Is an adult biting a child a common or uncommon form of child abuse?

THE WITNESS: Uncommon. I've been doing full time child abuse evaluations for the last 10 plus years and I've probably evaluated only a handful of children who -- where they are abusively bitten, repeatedly bitten.

PROSECUTOR: What would that suggest to you when an adult bites a child?

DEFENSE COUNSEL: Objection, speculation.

THE COURT: Overruled.

THE WITNESS: I think that adults biting children is very unusual, particularly in my opinion particularly vicious.

DEFENSE COUNSEL: Objection, argumentative.

THE COURT: Overruled.

THE WITNESS: I think it's not typical of what happens when people get frustrated and slap a child or spank a child which is a more common form of inflicting injury on children, and so I think it's -- it speaks to a very unusual and maybe even cruel form of child abuse.

DEFENSE COUNSEL: Your Honor, I'm going to object to that. That's inflammatory and it is argumentative.

THE COURT: I'll sustain the objection. The jury should disregard the last comment.

Whether the district court erred in admitting the "particularly vicious" statement is a close call. Assuming without deciding that the district court abused its discretion in admitting this testimony, we conclude that there is no reasonable likelihood that the

16

objected-to testimony significantly affected the verdict in this case. While the first short statement was admitted into evidence, the court sustained an objection to the more substantive testimony that followed. That testimony described how biting a child is different from more "typical" acts of abuse that occur when a parent or caretaker lashes out in frustration. Further, the "particularly vicious" statement occupies just three lines in the transcript, while Dr. Hudson's full testimony runs to 69 pages. In addition, Dr. Hudson was only one of several witnesses who testified as experts for the State. The State did not mention the contested testimony in its closing argument. And, while the defense had ample opportunity to attack the disputed testimony, both on cross-examination and during closing argument, it declined to do so. Lastly, the prejudicial effect of this testimony was no doubt blunted because Dr. Hudson was only stating the obvious. *See State v. Bowers*, 482 N.W.2d 774, 778 (Minn. 1992) (stating that medical examiner's testimony that the depth of the victim's stab wound indicated that the stabbing was an intentional act "was only stating the obvious," given that the knife blade was shorter than the wound was long). These factors, taken together, lead us to conclude that there was no reasonable likelihood that the objected-to testimony significantly affected the verdict in this case.

III.

Peltier next argues the prosecutor engaged in unobjected-to misconduct during closing argument by (1) disparaging the defense, (2) arguing facts not in evidence, and (3) misstating the law. According to Peltier, the prosecutor's alleged misconduct deprived her of a fair trial.

17

Because Peltier did not object to the prosecutor's remarks during closing argument, we review the alleged prosecutorial misconduct under the modified plain-error test. *See State v. Ramey*, 721 N.W.2d 294, 299-300 (Minn. 2006). "Under that test, the defendant has the burden to demonstrate that the misconduct constitutes (1) error, (2) that is plain." *State v. Matthews*, 779 N.W.2d 543, 551 (Minn. 2010). If plain error is established, the burden then shifts to the State to demonstrate that the error did not affect the defendant's substantial rights. *Matthews*, 779 N.W.2d at 551; *Ramey*, 721 N.W.2d at 300, 302. To meet the third prong, the State must show that there is "no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict." *Ramey*, 721 N.W.2d at 302 (citations omitted). If all three prongs of the test are met, "we may correct the error only if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Crowsbreast*, 629 N.W.2d at 437 (quoting *Johnson*, 520 U.S. at 467).

## A.

Peltier first claims the prosecutor disparaged her right to a jury trial. It is well-settled that the State has the right to vigorously argue its case. *State v. MacLennan*, 702 N.W.2d 219, 236 (Minn. 2005). But a prosecutor is not permitted to disparage the defense in closing argument. *See State v. McDaniel*, 777 N.W.2d 739, 752 (Minn. 2010). The State may argue that there is no merit in a particular defense, but it may not belittle that defense either in the abstract or by suggesting that the defendant raised the defense because it was the only one with any hope for success. *MacLennan*, 702 N.W.2d at 236.

The prosecutor argued in closing:

> [T]he defendant has an absolute right to have the State prove its case by proof beyond a reasonable doubt to you because anything can happen during a trial. Witnesses may become unavailable. Evidence may not be admitted. Witnesses may not remember and recollect. You know, we had witnesses from out-of-state, maybe they wouldn't come. But none of that happened in this case, and you did hear all the evidence, and you're never going to have all the evidence, all the facts, because we don't have video cameras inside people's houses so you have to depend on the statements of witnesses.

The federal and state constitutions and our adversarial process protect the right of the accused to contest the evidence presented by the government. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). Indeed, the right to confront and cross-examine the government's witnesses is a "fundamental right" that allows a defendant to clarify or correct the testimony of the State's witnesses. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

We conclude that the prosecutor's remarks mischaracterized the reason for a trial. Implicit in the prosecutor's remarks is the suggestion that the only reason Peltier exercised her right to a trial was because she hoped some unforeseen circumstance might upset the State's case, or that the only way Peltier could be found not guilty would be if the State made a mistake. The comments further imply that Peltier only exercised her right to trial in a desperate attempt to "roll the dice," rather than to robustly confront the State's allegations with a meritorious defense. These statements were untrue and disparaging, and constituted misconduct.

19

## B.

Peltier next contends the prosecutor argued facts not in evidence: (1) that Peltier learned the abusive behavior from an ex-boyfriend, and (2) that Peltier exhibited a trait common to child abusers when she engaged in victim-blaming.

"[T]he State may present all legitimate arguments on the evidence and all proper inferences that can be drawn from that evidence in its closing argument." *State v. Munt*, 831 N.W.2d 569, 587 (Minn. 2013) (quoting *State v. Pearson*, 775 N.W.2d 155, 163 (Minn. 2009)). However, a lawyer may not speculate without a factual basis. *Pearson*, 775 N.W.2d at 163. "It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." *State v. Bobo*, 770 N.W.2d 129, 142 (Minn. 2009) (quoting *State v. Salitros*, 499 N.W.2d 815, 820 (Minn. 1993).

The arguments that Peltier learned abusive behavior from a past romantic partner and that she engaged in behavior common to child abusers are troubling. These claims have no basis in the record. It is true that evidence at trial suggested that Peltier and her children suffered abuse at the hands of her former partner, but no evidence was presented to show that domestic abuse is learned and passed on between adults. Similarly, the evidence is clear that Peltier publicly blamed Eric for his own injuries, but there is no indication that she did so because she felt a need to justify her actions or that this is a behavior common to child abusers. Because these inferences go to psychological hypotheses and are not adequately supported by either the facts in evidence or expert testimony, we conclude that they were improper in this case.

C.

Finally, Peltier alleges that the prosecutor misstated the law by arguing that a past pattern of child abuse can include past child abuse committed by Peltier against another child, J.P.

Minn. Stat. § 609.185(a)(5) provides that a person is guilty of first-degree murder if the person "causes the death of a minor while committing child abuse when the perpetrator has engaged in a past pattern of child abuse upon a child and the death occurs under circumstances manifesting an extreme indifference to human life." The Legislature amended the past-pattern language in the statute in 2005 from "a past pattern of child abuse upon *the* child" to "a past pattern of child abuse upon *a* child." Act of June 2, 2005, ch. 136, art. 17, § 10, 2005 Minn. Laws 901, 1127-28 (emphasis added); Minn. Stat. § 609.185(a)(5) (emphasis added). This amendment aligns the child abuse provision of the first-degree murder statute with the domestic-abuse provision of the same statute, which allows for a pattern of domestic abuse to be found in instances in which "the perpetrator has engaged in a past pattern of domestic abuse upon *the* victim or upon *another family or household member*." Minn. Stat. § 609.185(a)(6) (2014) (emphasis added). Because the statutory definitions of first-degree child-abuse murder and first-degree domestic-abuse murder have nearly identical language, we interpret the provisions in a similar fashion. *See State v. Johnson*, 773 N.W.2d 81, 86 (Minn. 2009). In *State v. Hayes*, we affirmed a conviction under the first-degree domestic-abuse murder provision that allows patterns of abuse against two different persons to be used as past-pattern evidence. 831 N.W.2d 546, 554-55 (Minn. 2013).

We conclude that the Legislature's amendment to Minn. Stat. § 609.185(a)(5) extended the reach of the statute to a perpetrator who has engaged in a past pattern of child abuse upon *any* child. Consequently, evidence of abuse against children other than the victim is admissible as past-pattern evidence. The prosecutor, therefore, did not misstate the law.

D.

We next examine whether the misconduct of disparaging the defense and arguing facts not in evidence affected Peltier's substantial rights. To answer this question, we consider: (1) the strength of the evidence against Peltier; (2) the pervasiveness of the erroneous conduct; and (3) whether Peltier had an opportunity to rebut any improper remarks. *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007).

We conclude that the prosecutor's improper remarks did not affect Peltier's substantial rights for three reasons. First, the evidence in support of the conviction is overwhelming. Second, the incidents of alleged misconduct were isolated, together comprising approximately one page of a 39-page closing argument. The prosecutor did not unduly emphasize, or repeat, any of these points, and none of them was central to the State's case. Finally, Peltier had ample opportunity to rebut the prosecutor's erroneous statements in her closing argument, even if she declined to do so. Thus, we conclude that the prosecutorial misconduct here did not affect Peltier's substantial rights.

IV.

For the foregoing reasons, we affirm Peltier's conviction for first-degree murder while committing child abuse.

Affirmed.

HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.