*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0399**

State of Minnesota,
Respondent,

vs.

Jawan Contrail Carroll,
Appellant.

**Filed April 22, 2024**
**Affirmed**
**Frisch, Judge**

Hennepin County District Court
File No. 27-CR-21-9949

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Frisch, Judge; and Halbrooks, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**FRISCH**, Judge

Following judgment of conviction for multiple counts of second-degree intentional murder and attempted murder, appellant challenges the sufficiency of the evidence at trial to disprove that he acted in self-defense and argues that the district court plainly erred in instructing the jury on self-defense and abused its discretion in admitting opinion testimony regarding surveillance-video footage. Because the evidence at trial was sufficient to disprove that appellant acted in self-defense, the district court properly instructed the jury on self-defense, and because the district court did not abuse its discretion by permitting opinion testimony about the content of surveillance-video footage, we affirm.

**FACTS**

Respondent State of Minnesota charged appellant Jawan Contrail Carroll with two counts of second-degree intentional murder in violation of Minn. Stat. § 609.19, subd. 1 (2020), and seven counts of attempted second-degree intentional murder in violation of Minn. Stat. §§ 609.17, subd. 1, .19, subd. 1 (2020). The matter proceeded to a jury trial. The facts elicited at trial are as follows.

On May 21, 2021, Carroll went to a bar in downtown Minneapolis with M.J. and another friend. C.R.J. was at the bar with his friend, D.W.-H. Carroll saw C.R.J. at the bar but did not interact with him. Carroll and his friends left the bar but later returned and stayed outside. A few minutes before the bar closed, C.R.J., D.W.-H., and their acquaintance exited the bar and walked to D.W.-H.'s car in an adjacent parking lot. After

2

a few minutes, they returned to the sidewalk in front of the bar where a large crowd was forming.

At approximately 2:00 a.m., now May 22, Carroll was standing on the sidewalk in front of the parking lot. C.R.J. approached Carroll's group. C.R.J. asked, "What you all doing down here?" Someone responded, "We can go anywhere we want." C.R.J. stated, "You know there's switches on these motherf-ckers." Then someone responded, "We got them b-tches too." D.W.-H. told C.R.J. that he was "[d]oing too much talking."

M.J. punched C.R.J. in the head and C.R.J. moved backwards. Carroll raised a weapon—a .40-caliber semiautomatic handgun that held 18 rounds—and fired shots toward C.R.J. and D.W.-H. People in the crowd ran away from the shots.

C.R.J. ran north toward the bar, turned, and fired his weapon—a nine-millimeter semiautomatic Glock handgun fitted with an extended magazine, which increased the capacity to 32 total rounds. The handgun was also fitted with a switch, which is a device that made the gun fully automatic. Carroll turned to run into the parking lot but was blocked by a chain strung across an entrance to the lot. Carroll fired again toward C.R.J., who was now standing north of Carroll on the sidewalk. Seconds later, C.R.J. collapsed to the ground. Carroll then ran around the chain and into the parking lot. C.R.J. died of multiple gunshot wounds. About ten seconds elapsed between the time that M.J. punched C.R.J. to the time that C.R.J. collapsed.

The gunfire impacted seven additional victims, who were north of the parking lot when the shooting occurred. C.B.J. was walking home from a different bar with a friend when the shooting occurred and died of a gunshot wound to the chest. The six surviving

victims suffered various injuries—a laceration to the neck and face, a gunshot to the wrist, gunshot wounds to the thigh and buttocks, gunshot wounds to the back of the shoulder and buttocks, a gunshot wound to the calf, and a gunshot wound to the forearm.

Before trial, Carroll noticed his intent at trial to rely on the defenses of self-defense and defense of others. At trial, Carroll presented evidence to support his position. D.J., Carroll's friend, testified that C.R.J. flashed a gun and said that it was a "19 with a switch." M.J. testified that he heard C.R.J. say, "Oh yeah, well, I got a 19X Glock on me. Guess what? You know you guys all are going today; right?" M.J. testified that he then turned around and saw C.R.J.'s hand inside his pants, which M.J. considered to be a "red flag." M.J. testified that he hit C.R.J. out of instinct—he did not know if C.R.J. was serious but did not want to take chances.

Carroll testified. He stated that he knew C.R.J. prior to 2021. Around 2015, C.R.J. "shot up" Carroll's friend's car during the day. Carroll was not concerned by C.R.J.'s presence at the bar. Later, when Carroll was standing outside of the bar with friends, C.R.J. approached them and asked Carroll, "What are you doing down here?" Carroll understood C.R.J.'s implication to be that Carroll "wasn't supposed to be in a public area." D.J. then told C.R.J. to "leave it alone." C.R.J. responded, "Why would I?" C.R.J. then showed Carroll and his friends the gun on his hip. D.W.-H. told C.R.J. that he was "doing too much talking." Carroll responded to C.R.J., "I'm not on that." C.R.J. then said, "You know I got the Glock 19 with a switch on it." Carroll testified that, at that point in the interaction, he had already seen C.R.J.'s gun with the extended magazine. Carroll responded, "We're not on that. It's my birthday weekend." C.R.J. then said, "I don't give

4

a f-ck about none of that. I'll kill your a-s." Carroll testified that M.J. punched C.R.J., and C.R.J. drew his gun.

The jury found Carroll guilty on all counts. The district court entered convictions for each count and imposed the following prison sentences: 326 months for the second-degree intentional murder of C.R.J. (count 1); 326 months for the second-degree intentional murder of C.B.J. (count 2), to be served consecutively with count 1; 180 months for the attempted second-degree intentional murder of D.W.-H. (count 3), to be served consecutively with counts 1 and 2; and 180 months each on the remaining counts, all to be served concurrently with count 3.

Carroll appeals.

## DECISION

Carroll asks us to reverse his convictions, arguing that the state did not prove beyond a reasonable doubt that he was not acting in self-defense. Alternatively, Carroll asks us to reverse his convictions and remand for a new trial because the district court plainly erred in instructing the jury on self-defense and because the district court abused its discretion by permitting video-interpretation testimony. We address each argument in turn.

**I.    The evidence was sufficient for the state to disprove beyond a reasonable doubt that Carroll acted in self-defense.**

Carroll argues that the state failed to disprove that he acted in self-defense with respect to each count. We disagree.

"In Minnesota, a person may act in self-defense if [they] reasonably believe[] that force is necessary and use[] only the level of force reasonably necessary to prevent the

5

bodily harm feared." *State v. Devens*, 852 N.W.2d 255, 258 (Minn. 2014). The defense of self-defense includes four elements: (1) "the absence of aggression or provocation on the part of the defendant"; (2) "the defendant's actual and honest belief that [they were] in imminent danger of . . . bodily harm"; (3) "the existence of reasonable grounds for that belief"; and (4) "the absence of a reasonable possibility of retreat to avoid the danger." *Id.* (quotation omitted). "Once a defendant meets the burden of going forward with evidence to support a claim of self-defense, the State bears the burden to disprove, beyond a reasonable doubt, one or more of the four elements." *Id.* (quotation omitted). The state "need only disprove beyond a reasonable doubt at least one of the elements of self-defense." *State v. Radke*, 821 N.W.2d 316, 324 (Minn. 2012).

When an element of an offense is supported by direct evidence, our review is limited to a "painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to permit the jurors to reach the verdict that they did." *State v. Horst*, 880 N.W.2d 24, 39-40 (Minn. 2016) (quotation omitted). We "assume that the jury believed the State's witnesses and disbelieved any evidence to the contrary." *State v. Harris*, 895 N.W.2d 592, 605 (Minn. 2017) (quotation omitted). "[D]irect evidence is evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Id.* at 599 (quotation omitted). Witness testimony "is direct evidence when it reflects a witness's personal observations and allows the jury to find the defendant guilty without having to draw any inferences." *Horst*, 880 N.W.2d at 40. And a video may also be direct evidence. *See State v. McCormick*, 835 N.W.2d 498, 507 (Minn. App. 2013) (stating that the

6

defendant's reenactment video was direct evidence of what the defendant did), *rev. denied* (Minn. Oct. 15, 2013).

Carroll argues that the state failed to disprove that he was acting in self-defense with respect to the murder of C.R.J. Viewing the evidence in the light most favorable to verdict, we conclude that the state disproved beyond a reasonable doubt at least one element of self-defense with respect to the murder of C.R.J.

First, the state disproved beyond a reasonable doubt that Carroll's fear of bodily harm was objectively reasonable. The reasonableness of the defendant's belief of imminent bodily harm is assessed under an objective standard. *State v. Johnson*, 719 N.W.2d 619, 631 (Minn. 2006). Carroll argues that his fear was reasonable because of C.R.J.'s threats; C.R.J. possessed an automatic weapon; Carroll knew of C.R.J.'s history of gun violence; and M.J., Carroll's friend, had punched C.R.J. in the head. While we acknowledge that defense counsel elicited evidence at trial that could have supported a determination that Carroll's fears were objectively reasonable, including witness testimony about the nature and extent of C.R.J.'s threats, we view the evidence in the light most favorable to the verdict. *Horst*, 880 N.W.2d at 40. That evidence includes D.W.-H.'s testimony that he believed that the threats "just looked like smack talking" and that C.R.J. was standing in one spot with his arms at his side and did not display his weapon. The surveillance video does not depict C.R.J. flashing or showing a weapon before Carroll displayed his own weapon and began shooting at C.R.J. Viewing the evidence in the light most favorable to the verdict, we conclude that the state presented sufficient evidence to

support a determination beyond a reasonable doubt that Carroll's fear was not objectively reasonable.

Second, and independently, the state disproved beyond a reasonable doubt that Carroll used a reasonable amount of force. "[A] number of factors are relevant to the determination of whether the level of force used was reasonable: age and size of victim and defendant; victim's reputation for violence; previous threats and/or altercations between victim and defendant; defendant's aggression, if any; victim's provocation, if any." *State v. Soukup*, 656 N.W.2d 424, 429 (Minn. App. 2003), *rev. denied* (Minn. Apr. 29, 2003). Carroll argues that he used a reasonable amount of force because he used a gun in response to C.R.J.'s threats and possession of a gun. Carroll testified that he knew C.R.J. had shot a car several years before this incident. And it is undisputed that C.R.J. was intoxicated, made provoking statements, and was armed. But Carroll and C.R.J. had not interacted that evening until just prior to the shooting. And the surveillance video depicts C.R.J. stumbling backwards when Carroll raised his gun and began shooting. Viewing the evidence in the light most favorable to the verdict, the state disproved beyond a reasonable doubt that Carroll responded to the perceived threat of bodily harm with a reasonable amount of force.

Carroll next argues that the state failed to disprove self-defense beyond a reasonable doubt with respect to the remaining counts because he fired the shots that led to those charges only after C.R.J. had fired 13 shots at Carroll. Carroll's assertion does not negate his conviction for the attempted murder of D.W.-H. because that conviction was based on Carroll directly pointing his gun at D.W.-H. before C.R.J. fired his gun at Carroll. And

8

Carroll's argument with respect to the other victims depends on the assertion that his second volley of shots was necessitated only by C.R.J.'s shots and that he was not the initial aggressor with respect to those shots. But the state presented evidence that C.R.J.'s shots were made in response to Carroll's initial shots, and therefore self-defense does not apply to Carroll's shots fired in response to C.R.J.'s shots. *See State v. Edwards*, 717 N.W.2d 405, 411 (Minn. 2006) ("[T]he law does not permit or justify one who intends to commit an assault upon another to design in advance his own defense by instigating a quarrel or a combat with a view thereby to create a situation wherein the affliction of the intended injury will appear to have been done in self-defense." (quotation omitted)).

The evidence presented at trial was therefore sufficient to disprove beyond a reasonable doubt that Carroll acted in self-defense.

## II.     The district court's self-defense jury instruction was not plainly erroneous.

Carroll argues that the district court plainly erred in instructing the jury on self-defense because the instruction included a requirement that Carroll must have responded to a physical offense, rather than any "act carrying the threat of bodily harm." We disagree.

We review the instruction for plain error because Carroll did not object to the jury instruction. *State v. Kelley*, 855 N.W.2d 269, 273 (Minn. 2014). "Under the plain-error doctrine, the appellant must show that there was (1) an error; (2) that is plain; and (3) the error must affect substantial rights." *Id.* at 273-74. "If the appellant satisfies the first three prongs of the plain-error doctrine, we may correct the error only if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 274 (quotation omitted).

9

"We afford district courts significant discretion to craft jury instructions." *Devens*, 852 N.W.2d at 257. "But a jury instruction is erroneous if it materially misstates the law." *Id.* We review jury instructions as a whole and determine whether they "accurately state the law in a manner that can be understood by the jury." *Kelley*, 855 N.W.2d at 274. "[F]or purposes of applying the plain-error doctrine the court examines the law in existence at the time of appellate review, not the law in existence at the time of the district court's error, to determine whether an error is plain." *Id.* at 277.

Our review of the record reveals that the district court did not instruct the jury that the threat C.R.J. made to Carroll must have been physical in nature. The district court instructed the jury, in relevant part:

> The defendant in this case asserts the defense of self or others. No crime is committed when a person uses reasonable force to resist an offense against a person if such offense was being committed or the person reasonably believed that it was.
>
> An offense against the person means an offense of a physical nature with the potential to cause bodily harm. Bodily harm means physical pain or injury or illness or any impairment of physical condition.
>
> It is lawful for a person who is resisting an offense against his person and who has reasonable grounds to believe that bodily injury is about to be inflicted to defend from an attack.

The district court instructed the jury that *the offense that threatened Carroll* must be physical in nature, which is consistent with the supreme court's recent decision in *State v. Lampkin*, 994 N.W.2d 280, 289 (Minn. 2023) (concluding that the phrase "offense against the person" used in Minn. Stat. § 609.06, subd. 1(3) (2022), which authorizes nonlethal

10

self-defense, "refers to offenses carrying the threat of bodily harm"). The type of offense that may be threatening to a person is not necessarily the same as the manner in which the threat may have been made. *Cf. State v. Peterson*, 411 N.W.2d 518, 521-22 (Minn. App. 1987) (reasoning that the district court would have acted within its discretion by granting the defendant's request for a self-defense jury instruction based on the facts that the victim made verbal threats to kill him, the defendant and victim were having a heated argument, and the defendant's belief that the victim might have a gun), *rev. denied* (Minn. Oct. 21, 1987). And the district court did not in its instruction limit the manner in which the threat may have been made to a threat that is physical in nature. Instead, it broadly instructed the jury that the grounds for self-defense need only be "reasonable."[1] We discern no error in the district court's jury instruction regarding the nature of the threat.[2]

### III. The district court did not abuse its discretion by permitting opinion testimony about the surveillance videos.

Carroll argues that the district court abused its discretion by permitting two officers—Lieutenant Torborg and Sergeant Thomsen—to testify as to their interpretation of surveillance videos as opinion testimony because the officers lacked first-hand

---

[1] Carroll notes that the *prosecutor* in closing argument characterized the law as requiring that the manner of the threat be physical in its nature. But on appeal, Carroll argues only that the *district court* erred. Because we conclude that the district court did not err, we do not address the impact of any misstatement by the prosecutor.

[2] Because the district court did not plainly err in its instruction, we do not reach Carroll's argument that *Lampkin* stands for the proposition that a person may act in self-defense in response to a threat of bodily harm, regardless of whether that threat was made verbally or physically. 994 N.W.2d at 287-88. We note, however, that *Lampkin* does not specifically address whether a district court must expressly instruct a jury that the threat causing belief of imminent bodily harm may be verbal or physical in nature. *Id.* at 285-90.

knowledge and their opinions were not helpful to the jury. Carroll also argues that the evidence was not admissible to correct an error in defense counsel's opening statement, when defense counsel displayed an altered image to the jury and asserted that the altered image showed C.R.J. holding a gun. We disagree.

Minnesota Rule of Evidence 701 allows a lay witness to testify as to opinions and inferences "which are (a) rationally based on the perception of the witness; [and] (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Minn. R. Evid. 704. To determine whether opinion testimony is helpful to the jury, "a distinction should be made between opinions as to factual matters," which are helpful, "and opinions involving a legal analysis or mixed questions of law and fact," which are unhelpful. Minn. R. Evid. 704 1977 comm. cmt. "We review the district court's evidentiary rulings for an abuse of discretion."[3] *State v. Peltier*, 874 N.W.2d 792, 802 (Minn. 2016). "[A]n appellant who alleges an error in the admission of evidence that does not implicate a constitutional right must prove that there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *Id.* (quotation omitted).

We begin by describing the surveillance videos of the shooting outside the bar. The entire shooting occurred over about ten seconds and the surveillance videos depict different

[3] The state asserts that we can apply plain-error review to at least some of the challenged testimony because Carroll did not object to each piece of that testimony. Given the extent and frequency of the objections, we decline to apply plain-error review.

angles of the shooting. The shooting occurred in the middle of a large crowd. The material events depicted in the video involved many people moving quickly and in different directions and occurred in rapid succession. The state offered the testimony of the two officers to help the jury understand each incremental event depicted in the videos.

Lieutenant Torborg was the state's second witness. During the shooting, Lieutenant Torborg was monitoring surveillance cameras showing downtown areas while inside the first precinct building, which is located about half a block away from the bar. In real time, Lieutenant Torborg watched the shooting occur on the surveillance camera and heard the shots when an officer made a call for an unrelated incident as the shooting occurred. After watching the footage again, Lieutenant Torborg left the precinct to try to locate the suspect.

During Lieutenant Torborg's testimony, the state published several related exhibits of the incident, including frame-by-frame screenshots taken from the videos. The state paused and played surveillance-video footage throughout Lieutenant Torborg's testimony, asking questions about what was happening based on Lieutenant Torborg's review of the surveillance video. For example, Lieutenant Torborg testified based on his review of the video that at one point "[C.R.J.] is basically recovering from being punched. And Mr. Carroll appears to be pulling a weapon."

At one point the state asked, "How about over of the course of from 1:58:50 to 1:58:54, could you describe [C.R.J.'s] movements?" Defense counsel objected. The district court overruled the objection, but instructed the jury:

> Ladies and gentlemen of the jury, I am overruling that
> objection. But I am noting that in the end, you have the same
> information in front of you that the witness does. And in the

13

end, that it is your observations of what you see that control here rather than the witness's observation of it. Thank you.

This type of questioning occurred with respect to four exhibits that were surveillance videos or slideshows showing still images from the surveillance videos.

Sergeant Thomsen, a homicide investigator for this case, testified later in the trial. Defense counsel objected to Sergeant Thomsen's testimony to the extent that he was going to "basically narrate the video" and on the ground that the evidence was cumulative. Following argument from the state, the district court declined to make a blanket ruling as to the testimony, stating:

> I will take the objection as it comes along. I guess I would ask the State to be mindful that I am not going to—at some point this crosses over from providing an enlightenment to the jury and a road map of pointing out things that perhaps a layperson might miss. That, I will allow.
>
> To the degree that it crosses over to being a proxy for argument and for the purposes of the objection more importantly has already been covered. Those I may sustain.
>
> At this point I am not going to make a blanket ruling that he can't comment on the video as it is presented.

During Sergeant Thomsen's testimony, the state published and then played portions of a new exhibit—a 34-minute composite video tracking Carroll's movements from various video sources—while asking Sergeant Thomsen questions about what was happening in the video. The state then repeated this exercise with exhibits that were previously admitted during Lieutenant Torborg's testimony. Defense counsel objected to the testimony as cumulative, which the district court overruled.

14

The state offered an additional exhibit—a side-by-side image depicting a watch on C.R.J.'s wrist and a dark spot on C.R.J.'s wrist. The state proffered this exhibit in response to defense counsel's use of an altered, but undisclosed, image during opening statement and related argument that Carroll and C.R.J. "[drew] their weapons almost simultaneously." The district court ultimately instructed the jury that the image shown by the defense during opening statement was altered and ruled that the image was inadmissible. But during Sergeant Thomsen's testimony, the district court stated:

> I have allowed this witness to go much farther than I already would on this issue . . . because of the impression that was left in openings from the altered photo. And so that the State is pursuing this with some emphasis does not strike me as problematic. It strikes me as an appropriate response to the altered photo.

The district court admitted the side-by-side exhibit, but limited Sergeant Thomsen's testimony, stating, "And I've already given you great license in light of the door—I will say it again—I think misleading impression that was given by the defense in its [opening]."

The district court did not abuse its discretion in admitting Lieutenant Torborg and Sergeant Thomsen's testimony as lay-witness opinion testimony, concluding that it was not unduly cumulative given the nature of the testimony and the circumstances presented during trial. The officers' testimony about their opinions as to factual matters were not merely repetitive of the video. Their testimony helped the jury understand the rapid succession of events depicted in the video and responded to the misleading impression associated with the altered image proffered by defense counsel during opening statement. We discern no abuse of discretion in permitting the officer's opinion testimony with respect

to the surveillance-video exhibits. *See State v. Skolte*, No. A18-2091, 2019 WL 5310717, at *1-4 (Minn. App. Oct. 21, 2019) (reasoning that the district court did not plainly err by permitting officers to testify that the defendant was the first aggressor in a fight when the officers provided lay-witness opinion testimony based on the officers' perceptions formed by viewing surveillance video and not witnessing the incident firsthand, and the testimony helped the jury because "[b]oth officers relied heavily on the surveillance video," "[one officer] described what was happening while the video played," and "[both officers] explained which evidence in the video caused them to believe that appellant was the aggressor"), *rev. denied* (Minn. Dec. 17, 2019); *State v. Clement*, No. A14-1646, 2015 WL 4393559, at *4-5 (Minn. App. July 20, 2015) (reasoning that the district court did not plainly err in permitting an officer to testify about the defendant's behavior on surveillance video because the "officer's testimony here was rationally based on his perception of the video, and was helpful to the jury's clear understanding of his testimony regarding the investigation and the decision to charge appellant," and defense counsel elicited further testimony about the contents of the video on cross-examination), *rev. denied* (Minn. Oct. 20, 2015).[4]

We also see no reasonable probability that this testimony significantly affected the verdict. In deciding the effect of erroneously admitted evidence on the verdict, we consider "(1) the manner in which the State presented the testimony; (2) whether the testimony was highly persuasive; (3) whether the State used the testimony in closing argument; and

---

[4] We cite nonprecedential opinions for their persuasive authority. Minn. R. Civ. App. P. 136.01, subd. 1(c).

16

(4) whether the defense effectively countered the testimony." *Peltier*, 874 N.W.2d at 802. Carroll argues that the evidence significantly affected the verdict because it was presented in a persuasive manner, related to who the initial aggressor was, and defense counsel was not able to effectively cross-examine one officer. We agree that the video exhibits were central to the state's case for disproving self-defense. But even assuming the evidence was erroneously admitted, we do not conclude that the officers' testimony significantly affected the verdict. The state specifically referenced the officers' testimony only once in closing arguments saying, "Sergeant Thomsen told you that in 2022, a modern homicide investigation entails reviewing video closely. This is what we're talking about, folks. This is reviewing the evidence about what happened." The district court instructed the jury to rely on their own observation of the video. *See State v. Ferguson*, 581 N.W.2d 824, 833 (Minn. 1998) ("We assume that the jury follows a [district] court's instructions."). And defense counsel cross-examined Lieutenant Torborg and Sergeant Thomsen about their interpretation of the content of the videos. *See Clement*, 2015 WL 4393559, at *5 (noting that defense counsel elicited further testimony about the contents of the video on cross-examination).

We therefore discern no abuse of discretion in the district court's determination that the officers' testimony regarding the surveillance videos was helpful to the jury, and we further conclude there is no reasonable possibility that this testimony significantly affected the verdict.

**Affirmed.**

17