STATE OF MINNESOTA

IN SUPREME COURT

A22-1803

<table>
<tr><td>Hennepin County</td><td>Thissen, J.</td></tr>
<tr><td></td><td>Took no part, Hennesy, Gaïtas, JJ.</td></tr>
<tr><td>State of Minnesota,</td><td></td></tr>
<tr><td>Respondent,</td><td></td></tr>
<tr><td>vs.</td><td>Filed: October 16, 2024</td></tr>
<tr><td></td><td>Office of Appellate Courts</td></tr>
<tr><td>Timothy Lee Heller,</td><td></td></tr>
<tr><td>Appellant.</td><td></td></tr>
</table>

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Nicole Cornale, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The alleged error in a venue instruction was harmless beyond a reasonable doubt.

2.      Evidence of several singular acts of abuse committed against different individual victims constitutes a past pattern of domestic abuse under Minnesota Statutes section 609.185(a)(6) (2022).

1

3.	The district court did not abuse its discretion in admitting evidence of a prior instance of abuse to prove a past pattern of domestic abuse under Minnesota Statutes section 609.185(a)(6) (2022) because the prior instance of abuse was connected to a steady or continuous pattern of abusive behavior that shows it is the defendant's regular way of acting and, accordingly, it was not too remote.

4.	The district court abused its discretion in admitting expert witness testimony on domestic violence screening lethality factors, but the admission of the evidence was harmless error.

5.	The district court did not err in excluding certain purported alternative-perpetrator-related evidence.

Affirmed.

O P I N I O N

THISSEN, Justice.

Timothy Heller appeals his conviction for first-degree domestic abuse murder, Minn. Stat. § 609.185(a)(6) (2022).  Heller was convicted for the domestic abuse murder of Lacy Krube who died as a result of serious harm to her stomach.  Heller claims he is entitled to a new trial because of two errors in the jury instructions, the admission of past pattern evidence from over 20 years before the victim's death, the allowance of expert testimony on domestic violence lethality factors by an investigating officer, and the exclusion of alternative-perpetrator evidence.  We affirm.

## FACTS

In February 2021, Heller moved into his brother's house in Hennepin County. Heller's brother lived with his fiancée and their three children. The house had three levels: Heller stayed in a room on the top level, the children had rooms on the main floor, and Heller's brother and his fiancée had a room in the basement.

Approximately one week after Heller came to stay with his brother and the brother's fiancée, Heller's girlfriend, Lacy Krube, joined him. The fiancée testified that when Lacy arrived at her home, Lacy had a mark on her face that looked like a healing black eye. A few days later, the brother and his fiancée decided Lacy could no longer stay with them. On February 19, 2021, they informed Heller that Lacy had to leave. The fiancée did not see Heller or Lacy for the rest of the day. The fiancée testified that she believed Heller and Lacy were no longer in the house because when she called out to the upstairs room no one responded.

The day after Lacy's death, the police searched the bedroom in Heller's brother's home where Heller and Lacy had been staying. They found blood on the bed and walls, holes in the wall, and dusty handprints on the wall over the bed. A witness testified that Heller admitted to hitting Lacy three times and tossing her over his shoulder into the wall of their room at his brother's home.

On January 20, the day after Lacy was asked to leave, the fiancée saw Heller and Lacy walk past her house while sitting in her truck. From her truck, the fiancée observed that Lacy's face was "fucked up" and she told Lacy to get into the truck. Lacy got into the truck and the fiancée locked the doors. The fiancée called Heller a "monster," to which

3

Heller responded, "[Lacy] was telling me mean things." Heller's brother came out of the house, saw Lacy's face, and then he and Heller got in a fist fight. Heller threatened to call the police and the fiancée responded, "Go ahead, and we'll tell them why this fight started."

Heller's brother got into the truck with his fiancée and Lacy and the three drove away as Heller walked off in a different direction. The State claimed at trial that Heller inflicted the injuries that caused Lacy's death at some time before Lacy was driven away.

The fiancée tried to convince Lacy to go to the hospital, but Lacy refused, saying she had warrants. Lacy asked to be dropped off at the house where her ex-boyfriend, J.R., was living with his family. A photo taken before Lacy was dropped off at J.R.'s home shows that Lacy's face was severely beaten, with black eyes, lacerations, and extreme swelling. Both Heller's brother and his fiancée testified that, during this time, Lacy did not complain about any pain. They dropped Lacy off at J.R.'s home in Ramsey County around 6:20 p.m.

At around 8:00 p.m., the fiancée texted Lacy, "I should have step[ped] in earlier just remember you didn't do shit to deserve that and he will never ever change . . . ." Lacy responded, "Thank u . . . for getting me away from him. We should get together this weekend[.]"

J.R. testified that Lacy looked "really bad" when she arrived at his home and that she told him Heller had "beat her ass." She was also complaining of stomach pain, bending over a sink at one point, but J.R. thought she seemed "fine" after taking a "blast" of drugs.

Sometime later that night, Lacy overdosed. J.R. and his brother revived Lacy by administering Narcan and aggressive cardiopulmonary resuscitation (CPR). One of J.R.'s

4

friends was also present during Lacy's overdose. The friend confirmed that Lacy's face was bruised when she arrived at J.R.'s house. The friend also testified that he remembered seeing J.R. shove Lacy once on the night of February 20.

In the early afternoon of February 21, Lacy was found unresponsive. J.R.'s brother began CPR and, at some point, called 911 to report an "overdose." Emergency responders arrived to find Lacy in the basement, along with drug paraphernalia, empty Narcan bottles, and blood on the bed, sink, and other areas. The paramedics pronounced Lacy dead.

On February 23, the police arrested Heller. Heller had a jacket in his possession with Lacy's blood on it. In an interview with police, Heller told the police that Lacy had been beaten by J.R. "two weeks"[1] before.

Assistant Ramsey County Medical Examiner Dr. Victor Froloff performed Lacy's autopsy. Dr. Froloff reported a substantial number of contusions across Lacy's body, especially on her face and torso. Lacy also showed signs of "cauliflower ear" and the injuries on Lacy's neck demonstrated that someone had applied pressure to her neck at some point. Dr. Froloff found that these injuries were sustained over multiple days before her death. A perforation in Lacy's stomach corresponded with an injury to her abdomen. Dr. Froloff asserted that the stomach injury caused acute peritonitis and that Lacy died as

---

[1] The record is unclear regarding when J.R. allegedly beat Lacy. One witness testified that she was told that J.R. beat Lacy only two days before Lacy arrived at Heller's brother's house. The number of days Lacy spent at Heller's brother's house is also unclear.

a result of the peritonitis.[2] Dr. Froloff also stated that while CPR is known to cause internal injuries, he has "never observed damage to the stomach as a result of . . . CPR."

Toxicology testing results revealed a level of fentanyl in Lacy's system that would have been lethal for some people, but Dr. Froloff testified that Lacy's addiction habit likely gave her a high tolerance and that the fentanyl may have actually helped Lacy survive for longer "because it's a painkiller." Dr. Froloff acknowledged that he found acute peritonitis to be the cause of death before receiving the toxicology report, but he also testified that the toxicology results did not alter his opinion about the cause of death.

Dr. Froloff explained that a rupture to the stomach can start small and get bigger over time, making it "really difficult" to estimate when Lacy received the injury that ruptured her stomach. He estimated that the injury was received "probably days . . . but not weeks" before her death.

A grand jury indicted Heller for first-degree domestic abuse murder and second-degree felony murder. Heller pleaded not guilty.

At trial, Heller asserted an alternative-perpetrator defense on the theory that J.R. dealt the blow that perforated Lacy's stomach. The district court determined that Heller satisfied the threshold for presenting an alternative-perpetrator defense to the jury under *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn. 1977), because he proffered sufficient evidence to show an inherent tendency to connect J.R. with the actual commission of the

---

[2]     Peritonitis is an inflammation of the membrane lining the cavity of the abdomen and covering the abdominal organs, typically caused by bacterial infection either via the blood or after rupture of an abdominal organ.

6

crime. As noted, evidence admitted at trial showed that J.R. shoved Lacy on the night before she died. The district court, however, disallowed Heller from introducing other pieces of alternative-perpetrator evidence, specifically: the fiancée's statement that, upon arriving at her home, Lacy told the fiancée that the mark on her eye was an injury from J.R.; J.R.'s admission to slapping Lacy in the past; and the fact that members of J.R.'s family obtained a protection order against him.

To show a past pattern of domestic abuse against Lacy—one of the elements of domestic abuse murder—the prosecutor submitted evidence of Heller's past domestic abuse against five different victims at intervals between the late 1990s and 2020. The evidence included Heller's 2005 guilty plea for the domestic assault strangulation of his mother; a 2012 conviction for abusing V.S.; a 2016 admission by Heller to abusing S.S. multiple times over the previous two years; and Heller's admission of abusing Lacy. Relevant to this appeal, the State also introduced evidence of Heller's past abuse of J.L., who was the only victim that testified at trial. J.L. testified that in the late-1990s, Heller punched her, kicked her in the stomach while she was pregnant, choked her, and forced her to have sex with him while she was babysitting her nephews. The State also introduced the transcript from Heller's 2000 guilty plea to gross misdemeanor domestic assault in which Heller admitted to "pushing" J.L. and that J.L. had a black eye and severe bruising about her whole body. Heller objected to the introduction of the transcript, arguing that his conduct toward J.L. was too remote in time to be admissible.

Over Heller's objection, the district court allowed a St. Paul police officer who investigated Lacy's death to offer expert testimony on "lethality factors"—a set of criteria

that helps professionals assess a domestic abuse victim's risk of being killed by their abuser. The officer described specific types of prior domestic violence that are correlated with cases where the victim of domestic abuse is later killed, some, but not all, of which corresponded to general facts proved about the relationship between Heller and Lacy.

Although Lacy died in Ramsey County, the trial was held in Hennepin County. The district court instructed the jury on venue as follows:

> The elements of first-degree murder, while committing domestic abuse with past pattern of domestic abuse, are . . .
>
> [T]he defendant's act took place between February 16th and February 20th, 2021, in Hennepin County. Venue in Hennepin County is established when any element of the offense was committed in Hennepin County or where *the crime was set in operation and/or triggered in Hennepin County*.

(Emphasis added.) Heller objected to the italicized portion of this instruction.

In instructing on the element of past pattern of domestic abuse, the district court instructed the jury as follows:

> [T]he defendant engaged in a *past pattern of domestic abuse against Lacy Jo Krube and/or other persons who qualify as defendant's family or household members*. A "past pattern" consists of prior acts of domestic abuse which form a reliable sample of observable traits or acts which characterize an individual's behavior. *More than one prior domestic act of domestic abuse is required for there to be a past pattern.*

(Emphasis added.) Heller did not object to this jury instruction at trial.

The jury found Heller guilty of first-degree domestic violence murder. The district court denied Heller's motion for a new trial and sentenced him to life in prison. Heller appealed.

8

## ANALYSIS

Heller is requesting a new trial on the grounds that the district court committed the following errors of law: (1) instructing the jury that the State could prove venue by establishing that the "crime was set in operation and/or triggered in Hennepin County"; (2) instructing the jury that it could convict Heller of domestic abuse homicide if he had engaged in a past pattern of domestic abuse against "[Lacy] and/or other persons who qualify as defendant's family or household members"; (3) allowing the State to introduce evidence that, decades before Lacy's death, Heller physically and sexually assaulted a different woman; (4) allowing an investigating officer's expert testimony about "lethality factors" that concern a domestic abuse victim's risk of being killed by an abuser; and (5) excluding certain evidence related to Heller's alternative-perpetrator defense. We review each argument in turn.

### I.

Heller argues that the district court's jury instruction on venue was erroneous. The disputed instruction stated:

> [T]he defendant's act took place between February 16th and February 20th, 2021, in Hennepin County. Venue in Hennepin County is established when any element of the offense was committed in Hennepin County or where *the crime was set in operation and/or triggered in Hennepin County*.

(Emphasis added.) Heller contends that the district court abused its discretion by including the italicized language in the jury instruction. He asserts that the italicized language improperly allowed the jury to convict him of the offense "if something [occurring in

Hennepin County] set the crime in motion even if that something was not an element of the crime or related to an element of the crime."

We review jury instructions for abuse of discretion. *State v. Peltier*, 874 N.W.2d 792, 797 (Minn. 2016). Although district courts have "considerable latitude in selecting jury instructions," those "instructions must fairly and adequately explain the law of the case." *Id.* at 797. A district court abuses its discretion when its jury instructions "confuse, mislead, or materially misstate the law." *State v. Vang*, 774 N.W.2d 566, 581 (Minn. 2009).

Minnesota Statutes section 627.01, subdivision 1 (2022), provides that "[e]xcept as otherwise provided by rule 24 of the Rules of Criminal Procedure, every criminal cause shall be tried in the county where the offense was committed." Minn. Stat. § 627.01, subd. 1. " 'County where the offense was committed' means any county where any element of the offense was committed . . . ." *Id.*, subd. 2 (2022). Neither the statute nor Rule 24 provides for venue in a county where the crime was "set in operation and/or triggered"—the language used in the jury instruction.

One of the exceptions identified in section 627.01 provides that "if a person commits an act in one county causing injury or death in another county, the offense may be prosecuted in either county. If doubt exists as to where the act, injury, or death occurred, the offense may be prosecuted in any of the counties." Minn. R. Crim. P. 24.02, subd. 3. In other words, a defendant may be prosecuted in the county where the act causing injury or death occurred or in the county where the injury or death occurred. Heller does not claim that venue cannot be established under subdivision 3.

We do not decide whether the district court's venue instruction stating that venue is established "where the crime was set in operation and/or triggered" failed to explain the law of the case fairly and adequately. Rather, we conclude that any potential error was harmless.

"A properly objected-to instructional error regarding an element of an offense requires a new trial only if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict." *State v. Koppi*, 798 N.W.2d 358, 364 (Minn. 2011) (citation omitted) (internal quotation marks omitted). An error has no significant impact on the verdict beyond a reasonable doubt if the guilty verdict is "surely unattributable" to the error. *State v. Bigbear*, 10 N.W.3d 48, 54 n.7 (Minn. 2024) (citation omitted) (quotation marks omitted).[3]

In this case, Lacy died in Ramsey County. Because Heller was found guilty, however, the jury necessarily found that an act of Heller caused Lacy's death. The record does not contain *any* evidence that Heller committed such an act outside Hennepin County; instead, the testimony and evidence presented at trial focused on the assaultive conduct Heller committed against Lacy at his brother's home that is undoubtedly located in Hennepin County. No arguments were made in closing argument or otherwise that Heller's

---

[3]     The State does not dispute that proper venue is an essential element of the crime and accordingly, for purposes of resolving this case, we assume without deciding that venue is an essential element. *See State v. Johnson*, 995 N.W.2d 155, 161 n.4 (Minn. 2023) (determining that, although we have not expressly decided which standard of proof applies to questions of proper venue, we need not do so because the evidence was sufficient to prove venue beyond a reasonable doubt). Consequently, we apply the heightened constitutional harmless error standard.

abuse of Lacy occurred anywhere other than Hennepin County.[4]  Consequently, venue is legally proper in Hennepin County.  *See* Minn. R. Crim. P. 24.02, subd. 3 (stating that a crime may be prosecuted in a county where the act causing the injury or death occurred and, "if doubt exists as to where the act . . . occurred," the case may be prosecuted in any county where the act may have occurred).

On this record, which shows that the jury found beyond a reasonable doubt that Heller's abuse of Lacy in Hennepin County caused her death, we conclude that the venue jury instruction did not confuse the jury such that it determined *venue* was proper only because Heller committed some act *other than* an act related to an element of the crime—the acts of abuse that caused Lacy's death—in Hennepin County.  Rather, the jury necessarily found beyond a reasonable doubt that an act related to an element of the crime (the act that caused Lacy's death) occurred in Hennepin County.  Accordingly, we conclude that the guilty verdict is surely unattributable to the claimed error in the jury instructions.

II.

We next turn to Heller's argument that the jury instruction on the past pattern element of domestic abuse murder, Minn. Stat. § 609.185(a)(6), materially misstated the law, constituting an abuse of discretion.  *Peltier*, 874 N.W.2d at 797.  The district court instructed the jury as follows:

> [T]he defendant engaged in a past pattern of domestic abuse against Lacy Jo Krube and/or other persons who qualify as defendant's family or household members.  A "past pattern" consists of prior acts of domestic abuse which

---

[4]      Heller's counsel did assert in closing that the State did not establish venue because it did not prove that *any* act of Heller caused Lacy's death.  Heller's counsel did not point to any acts of Heller that occurred outside Hennepin County.

12

form a reliable sample of observable traits or acts which characterize an individual's behavior. More than one prior domestic act of domestic abuse is required for there to be a past pattern.

Because Heller did not object to the instruction, we review the district court's instruction for plain error. *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001). For Heller to succeed on plain-error review, he must demonstrate (1) an error, (2) that is plain, and (3) affected his substantial rights. *State v. Lampkin*, 994 N.W.2d 280, 285 (Minn. 2023). Even if these three factors are met, reversal is proper if "we must address the error to ensure fairness and the integrity of the judicial proceedings." *Id*.

Heller's argument that the jury instruction misstated the law turns on his interpretation of section 609.185(a)(6). The statute provides that a person is guilty of first-degree murder if the person "causes the death of a human being while committing domestic abuse, *when the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member* and the death occurs under circumstances manifesting an extreme indifference to human life." Minn. Stat. § 609.185(a)(6) (emphasis added). Heller asserts that the statute requires the State to prove that he committed multiple acts of violence against a single individual family or household member, rather than single, isolated acts against multiple family or household members. According to Heller, using the phrase "and/or" and changing the singular language of the statute ("member") to plural ("members") in the jury instructions, allowed the jury to find a past pattern even if it determined Heller committed a single act of violence against each victim.

13

We disagree with Heller's reading of section 609.185(a)(6). The statute does not define "past pattern." *Id.* We have said that a pattern of abuse is shown with evidence that "suggests" the defendant's "regular way of acting" is "by committing domestic abuse." *State v. Sanchez-Diaz*, 683 N.W.2d 824, 832 (Minn. 2004). Further, while we have held that one act of domestic abuse is insufficient to create a pattern, *id.*, we have declined to set a minimum number of multiple abusive acts sufficient to create a past pattern. *See State v. Cross*, 577 N.W.2d 721, 726 (Minn. 1998) (stating that the statute does not "specify a minimum number of incidents which must be proven in order to find a 'pattern' "). Finally, the language of the statute itself tells us that the acts of domestic abuse that comprise a pattern may be upon the victim of the crime charged *or* upon a different individual ("another family or household member"). Minn. Stat. § 609.185(a)(6). We conclude that committing individual single acts of domestic violence against multiple different family or household members is sufficient to allow a jury to conclude that domestic abuse is the defendant's regular way of acting. Because the instructions accurately presented the law, there was no error. *Lampkin*, 994 N.W.2d at 289–90.

III.

Heller next claims the district court committed reversible error in allowing J.L. to testify about her relationship with Heller in the late 1990s, during which he repeatedly abused her. Because the abuse testified to by J.L. occurred over 20 years ago, Heller argues that the evidence was irrelevant and inadmissible to prove past-pattern evidence.

J.L. testified that, while she was in a relationship with Heller, Heller punched her, kicked her in the stomach while she was pregnant, choked her, and forced her to have sex

14

with him while she was babysitting her nephews.  The State also introduced the transcript of Heller's 2000 guilty plea to gross misdemeanor domestic assault in which he admitted to "pushing" J.L.  That transcript also noted that J.L. had a black eye and severe bruising all over her body.  The State introduced this evidence as part of its effort to prove the past pattern of abuse element of domestic abuse murder.  *See* Minn. Stat. § 609.185(a)(6).

Heller objected to the admission of the evidence of his abuse of J.L.  Like other evidentiary rulings, we review the district court's decision for an abuse of discretion.  *State v. Nunn*, 561 N.W.2d 902, 906–07 (Minn. 1997).  Further, if we conclude the ruling was erroneous, we will not reverse if the error was harmless.  *Id.* at 907.

Recognizing that "a pattern suggests a regular way of acting by committing acts of domestic abuse," we have stated that, to be a pattern of domestic abuse, each act of domestic abuse must be "sufficiently proximate in time [to one another] to constitute a pattern."  *State v. Clark*, 739 N.W.2d 412, 421 (Minn. 2007) (citation omitted) (internal quotation marks omitted).  "[S]ome incidents are too distant in time from each other to constitute a pattern or a regular way of acting."  *Id.*

Heller relies on *Clark* to support his argument.  In *Clark*, we held that past acts of domestic abuse against the victim that occurred over 10 years before the charged offense were not relevant to establishing a pattern of domestic abuse.  *Id.* at 421–22.  The evidence in *Clark* showed four prior incidents of violence against the victim: two that occurred 13–15 years before the murder and two that occurred during the year leading up to the murder.  *Id.* at 421.  This court held that the two events that occurred over a decade prior to the more recent instances of domestic abuse were not relevant past pattern evidence

15

because they were too "remote" from the more recent events to establish the defendant's "regular way of acting." *Id.* The fact that the defendant and the victim had a relationship without violence for 12–13 years between the acts of domestic abuse at the beginning of the relationship and the later acts of domestic abuse indicated that the defendant's acts of abuse at the start of the relationship did not indicate a regular way of acting. *Id.*

This case differs from *Clark*. Here, there is not the same decade-plus gap in time without abusive behavior as there was in *Clark*. Over a period of 20 years, Heller's pattern of domestic abuse is far more consistent than the defendant in *Clark* and, accordingly, more indicative that domestic abuse is Heller's "regular way of acting." *Id.* at 421. While *some* of Heller's acts of domestic abuse against multiple victims occurred over 20 years earlier, none of the offenses were more than six or seven years apart and the acts of abuse occurred in a regular pattern. Heller consistently abused J.L. in the late-1990s. Five years after the 2000 conviction for abuse against J.L., Heller submitted a guilty plea for the domestic assault strangulation of his mother. Six years later, in 2012, Heller was convicted for abusing V.S. In 2016, Heller admitted to abusing S.S. multiple times over the previous two years. Four years later, in 2020, Heller admitted to abusing Lacy. These acts of domestic abuse created a pattern by being sufficiently proximate to one another. *Id.*

Consequently, on these facts, we reject Heller's argument that the evidence of abuse against J.L. was too remote—and thus irrelevant—to proving domestic abuse was Heller's

regular way of acting.[5] Therefore, the district court did not abuse its discretion in admitting the evidence of abuse against J.L.

IV.

We next turn to Heller's argument that the district court abused its discretion by allowing a St. Paul police officer who investigated Lacy's death to offer expert testimony on "lethality factors."

The officer testified that lethality factors are a set of criteria that help professionals assess a domestic abuse victim's risk of being killed by their abuser. When asked to provide examples of lethality factors, the officer replied:

> Well, one of the most serious [lethality factors] is strangulation. We know that's an indicator of future fatal violence. Another one would be the offender's access to firearms. Another would be the threats of violence in the past; the past pattern of abuse; pregnancy, if the person was pregnant at the time of the assault; and then it's very dangerous when a person is leaving a relationship as well.

The prosecutor then asked the officer if the lethality factors "inform how you might respond to a case if some of these factors are present?" The officer answered, "Yes." The prosecutor then proceeded with the following line of questioning:

> Q. [D]uring the course of your work with the family violence unit and based on your training and experience, have you encountered situations where it may be a first-time police response, but you learn there's actually a long history of violence?
> A. Yes.
> Q. Is that an uncommon occurrence?
> A. No.

---

[5] We emphasize that the question of whether past abuse shows a regular way of acting is a case-specific analysis. Our decision today should not be read to say that a gap of six to seven years will *never* qualify as being too remote, especially in the absence of consistently repeated abusive conduct.

Q. Have you had experiences where people who have—where people who have suffered even very serious injuries have not sought out medical treatment?

A. Yes.

Q. Does [sic] some of the factors that you previously testified about, can they play into why a person may or may not seek out medical treatment as well?

A. Absolutely.

Q. While you're not working in the family violence unit anymore, in your work as a homicide investigator, do you incorporate some of the same training and the blueprint background ideals into your investigations in homicides?

A. Yes.

Heller objected to the admission of the officer's lethality factors testimony. The district court overruled the objection, explaining:

> On the lethality factors, [the officer] may discuss them based on his training and experience as a general dynamic on lethality factors for two reasons: Number one, to establish what Saint Paul's response is to domestic violence and generally what their training includes, but also the lethality factors, without him commenting on how it fits this case, how the lethality factors, that is relevant to past pattern.

We review the admission of expert testimony for abuse of discretion. *State v. Garland*, 942 N.W.2d 732, 742 (Minn. 2020). Admitting expert testimony is an abuse of discretion if the district court's decision to admit is "based on an erroneous view of the law or is against logic and the facts in the record." *Id.* (citation omitted) (internal quotation marks omitted). Even if the district court's admission of evidence was in error, such admission is harmless if it did not significantly impact the verdict. *See Peltier*, 874 N.W.2d at 802.

In assessing Heller's argument, we start with some general principles. Expert testimony must be "helpful to the jury" to be admissible. *State v. Obeta*, 796 N.W.2d 282,

18

289 (Minn. 2011); *see also* Minn. R. Evid. 702 ("If . . . specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise."). Further, "[e]xpert testimony may also be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury." *State v. Sontoya*, 788 N.W.2d 868, 872–73 (Minn. 2010) (citing Minn. R. Evid. 403).

In particular, evidence that a defendant fits a certain profile is a type of evidence where the unfair prejudice to the defendant outweighs the probative value of the evidence. *State v. Williams*, 525 N.W.2d 538, 547–49 (Minn. 1994) (holding that drug courier profile evidence was not admissible and distinguishing the use of such profile evidence in police investigations from its use in court proceedings); *State v. Loebach*, 310 N.W.2d 58, 63 (Minn. 1981) (holding that "battering parent" profile evidence is inadmissible). In *Williams*, the State, under the guise of having an officer explain his investigation in a drug case, elicited drug courier profile evidence at trial.[6] *Williams*, 525 N.W.2d at 541. We concluded the evidence was inadmissible, explaining:

> [E]vidence that a defendant has traits shared by those who in the past have acted as drug couriers "seems akin to character evidence." . . . "Normally proof of character involves witnesses who generalize on the basis of past acts of the defendant and this generalization is used to support an inference as to the conduct in issue. The drug courier profile involves a generalization based on the past acts of third persons. The jury is asked to infer from the fact that the defendant shares some of the characteristics of these third persons that he shares their guilt of drug smuggling."

---

[6]     We noted that the issue was "the propriety of the prosecutor's eliciting the drug courier profile evidence not at a pretrial suppression hearing but during the state's case-in-chief at trial." *Williams*, 525 N.W.2d at 547.

*Id.* at 547–48 (quoting 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure—Evidence* § 5233 (Interim ed. 1992 & Supp. 1994)).

With that background in mind, we turn to the question of whether the lethality factors evidence was erroneously admitted and conclude that the lethality factors evidence as presented at the trial is akin to the profile evidence we disapproved of in *Williams* and *Loebach.* The fundamental gist of the evidence tends to show that a person who has made threats of violence in the past and who has a past pattern of abuse is likely to kill the victim of their abuse. In the jury's eyes, an expert listing factors indicating a high probability an abuser *would* kill their domestic partner may be indistinguishable from an expert listing factors indicating that the defendant *did* kill his domestic partner. Put differently, the evidence showing an increased likelihood of any domestic abuser killing their victim may have signaled to the jury—albeit implicitly—that Heller was likely to kill Lacy. Thus, although the officer did not testify that Heller met the profile of an abuser, the purpose of the lethality factors evidence was to "demonstrate that appellant fit within the [domestic abuser] profile." *Loebach*, 310 N.W.2d at 63.

In short, as in *Williams* and *Loebach*, "the jury was impliedly urged to infer that since defendant's conduct fit the profile," the defendant must have been guilty. *Williams*, 525 N.W.2d at 548. The lethality factors evidence created a narrative that Heller killed Lacy because people like Heller tend to kill people like Lacy. As in *Williams* and *Loebach*, this is improper profile evidence.

The evidence itself is not otherwise probative in this case for the simple reason that Lacy had already been killed by the time the investigation took place. After all, if lethality

20

factors are a tool used to assess the risk of whether an abuse victim may be killed in the future, the applicability of those factors dissipates once a victim is killed. It is true that one of Heller's defenses was the absence of medical or police reports indicating that Heller had abused Lacy and no witness testified that they directly saw Heller abuse Lacy. Enmeshed in the lethality factors line of questioning, the officer testified that a victim of physical violence might not report their injuries to police or medical servicers in order to avoid future violence based on past threats. But that admissible testimony could have been offered as a stand-alone statement without wrapping it in the context of the lethality factors.

As noted, the district court thought the evidence was relevant because it offered general information on how the St. Paul police respond to domestic violence and it "is relevant to past pattern." We fail to see why general information about how the police assess the probabilistic risk of an abuse victim's future murder is relevant to proving Heller's guilt—outside of improper profile evidence of the type we have repudiated in *Williams* and *Loebach*.

We also do not understand what the district court was referring to when it stated that the lethality factors are relevant to past pattern. Whether the court was referring to evidence of Heller's prior bad acts admissible under a Minn. R. Evid. 404(b) exception or evidence of Heller's previous acts of domestic abuse offered to prove an element of domestic abuse murder; both of those scenarios pertain to *Heller*'s actions. Testimony about lethality factors offers no evidence of Heller's actions and is therefore not relevant to past pattern. The district court therefore abused its discretion in allowing the officer to testify about the lethality factors.

21

Having concluded that admission of the testimony was error and an abuse of discretion—and noting that Heller objected to the admission of the evidence—we consider whether this error requires reversal of Heller's conviction under the harmless-error standard. Admission of testimony is a reversible abuse of discretion if there is "a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Matthews*, 800 N.W.2d 629, 633 (Minn. 2011) (citation omitted) (internal quotation marks omitted). To determine if there is a reasonable possibility that the admission of the lethality factors testimony significantly affected the verdict, "we conduct an independent review of the record and consider all relevant factors that may bear on the question." *State v. Davenport*, 947 N.W.2d 251, 262 (Minn. 2020). We assess the impact of the evidence's admission on the verdict by considering factors that include, but are not limited to, " '(1) the manner in which the party presented the evidence, (2) whether the evidence was highly persuasive, (3) whether the party who offered the evidence used it in closing argument, and (4) whether the defense effectively countered the testimony.' " *Bigbear*, 10 N.W.3d at 54 (Minn. 2024) (quoting *State v. Smith*, 940 N.W.2d 497, 505 (Minn. 2020)).

Our review of the trial as a whole leads us to conclude that the admission of the testimony was harmless. Notably, while it is true the officer was an important witness for the State, the discussion of the lethality factors was only a minor part of the officer's overall testimony. Further, the persuasiveness of the specific evidence was limited. The State made no effort to connect the lethality factors to the investigation or to Heller specifically. Only a few of the lethality factors that the officer identified, like a past pattern of abuse

22

and threats of abuse, related to Heller's relationship with Lacy. While there is evidence that Heller had strangled his mother in the past, Lacy did not die from strangulation. No evidence was adduced at trial that Heller had access to firearms and there was no evidence Lacy was trying to leave Heller when the fatal abuse was delivered. Moreover, the prosecution did not mention the lethality factors testimony in closing arguments, which is another factor weighing against the evidence impacting the jury's verdict. Reading the trial transcript as a whole, the brief lethality testimony simply floated in the ether.

We also acknowledge that Heller merely challenged the admissibility of the lethality factors evidence. He did not attempt to counter the evidence before the jury; that fact weighs against a conclusion that the error was harmless.[7] *See State v. McInnis*, 962 N.W.2d 874, 889 (Minn. 2021) (stating that unrebutted evidence weighs against an error being harmless, even when "the defendant chose to challenge admissibility and not to counter the evidence on the merits"). Finally, we also observe that the State presented strong evidence that Heller killed Lacy. *See State v. Caulfield*, 722 N.W.2d 304, 317 (Minn. 2006) (stating

---

[7]     Generally, the defense's failure to counter the State's evidence when given the opportunity points to harmless error. *See Peltier*, 874 N.W.2d at 803. The opposite, however, is true in "cases where the defendant does not attempt to counter the evidence on the merits, and only objects to its admissibility." *State v. Caulfield*, 722 N.W.2d 304, 315 (Minn. 2006). In *Caulfield*, we decided that "unrebutted evidence has greater impact" on the jury's verdict, so evidence challenged on its admissibility but not on the merits "weighs in favor of finding the error to be prejudicial." *Id.* Challenging the State's inappropriate use of the lethality factors in this case—especially since the testimony had little probative value—would only have highlighted the impermissible suggestion that Heller had the propensity to commit domestic violence murder. Therefore, it would be unfair for us to penalize the defense for not countering the evidence on the merits.

that a harmless error conclusion may be reinforced by the strength of the evidence of guilt if the improper evidence itself was not highly persuasive).

Balancing all relevant factors, we conclude that there is no reasonable possibility that the officer's testimony about lethality factors significantly affected the verdict. Accordingly, the error was harmless.

V.

We now consider Heller's claim that the district court abused its discretion by excluding evidence of prior bad acts of J.R.—the person Heller pointed to as an alternative perpetrator responsible for Lacy's death. The district court's application of the rules of evidence is reviewed for abuse of discretion. *State v. Hallmark*, 927 N.W.2d 281, 291 (Minn. 2019).

The district court concluded that Heller presented foundational evidence that tended to connect J.R. to Lacy's murder sufficient to allow Heller to present evidence to the jury that J.R., rather than Heller, killed Lacy. *See Hawkins*, 260 N.W.2d at 159 (stating that a defendant seeking to present an alternative-perpetrator defense at trial must lay a threshold foundation by providing evidence that tends to connect the alternative perpetrator to the offense). The State does not challenge that threshold determination on appeal.

Because Heller satisfied the threshold foundation test, he was allowed to present "evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act" to create reasonable doubt about Heller's guilt. *Id.* Such evidence can include evidence of

other crimes and bad acts of the third person—so-called reverse-*Spreigl* evidence. *State v. Gutierrez*, 667 N.W.2d 426, 436 (Minn. 2003).[8]

"[O]rdinary evidentiary rules" apply to the admissibility of alternative-perpetrator defense evidence. *State v. Jones*, 678 N.W.2d 1, 16 (Minn. 2004). Thus, alternative-perpetrator evidence must be admissible under the normal rules of evidence before it may be introduced at trial. *Id.*

Under this rule, then, hearsay evidence that an alternative perpetrator committed the crime is not admissible unless it qualifies under an exception to the hearsay rule. Similarly, evidence of other crimes, wrongs, or bad acts—like the evidence Heller sought to introduce about J.R.—is not admissible to prove that the alternative perpetrator had the propensity to commit the crime for which the defendant is on trial, but it may be admissible for other purposes. Minn. Rule of Evid. 404(b)(1) (providing that evidence of prior bad acts may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").

The test for determining if other bad acts evidence is admissible is the same for evidence that the State seeks to introduce against the defendant and for evidence the defendant seeks to introduce to implicate a third party as an alternative perpetrator. *State v. Johnson*, 568 N.W.2d 426, 433 (Minn. 1997). Accordingly, to admit reverse-*Spreigl* evidence, the defendant must show three things:

---

[8] In Minnesota, evidence of other crimes, wrongs, or acts sought to be admitted under Minn. R. Evid. 404(b) is referred to as *Spreigl* evidence after our decision in *State v. Spreigl*, 139 N.W.2d 167 (Minn. 1965).

(1)     clear and convincing evidence that the alternative perpetrator participated in the prior bad act;

(2)     that the prior bad act evidence is relevant and material to the charged crime—that the prior bad act evidence is offered to show the alternative perpetrator's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; and

(3)     that the probative value of the prior bad act evidence outweighs its potential for unfair prejudice.

*See* Minn. R. Evid. 404(b).

At trial, a witness who was present at J.R.'s home on the night Lacy died testified that J.R. shoved Lacy in the hours before she died. But the district court excluded certain other evidence that Heller sought to introduce to support his assertion that J.R. killed Lacy, specifically: (1) evidence that J.R. admitted to police he had slapped Lacy on previous occasions, (2) evidence of a court order barring J.R. from being in the house where his mother and brothers lived, and (3) evidence that Lacy told Heller's brother's fiancée that J.R. had given Lacy a black eye.

Heller challenges the district court's exclusion of the three pieces of evidence. Because the State is not challenging that Heller met the threshold test of sufficiently connecting J.R. to the crime, the question before us is whether the district court abused its discretion in excluding the three pieces of evidence because they were inadmissible under the Minnesota Rules of Evidence.

A.

Heller argues that the district court abused its discretion by excluding J.R.'s statement to police that he had slapped Lacy in the past. The district court initially ruled that the defense could introduce evidence that J.R. told the police that he slapped Lacy on

multiple occasions. After a witness unexpectedly told the jury that J.R. shoved Lacy on the night of her death, the State requested that the district court revisit the issue.[9]

The district court excluded the evidence under Rule 404(b)(1) after defense counsel failed to identify a relevant exception to the general rule that "[e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b)(1). The district court reasoned:

---

[9] Heller argues that the disputed alternative-perpetrator evidence is admissible under Minn. Stat. § 634.20 (2022), which governs "[e]vidence of domestic conduct by the accused," because the statute uses the word "accused," which could apply to either the defendant or an alternative perpetrator. He also argues, citing *State v. Boyce*, 170 N.W.2d 104, 115 (Minn. 1969), that even before section 634.20 was enacted, we recognized under the common law that relationship evidence was excepted from *Spreigl*. At trial, however, Heller conceded that the evidence was not admissible under Minn. Stat. § 634.20 and he did not raise the argument that the relationship evidence was otherwise admissible under the common law. To the extent that Heller now makes that argument before us, we review the claim for plain error. *State v. Mosley*, 853 N.W.2d 789, 797 n.2 (Minn. 2014) (observing that "to properly preserve a claim that evidence should be excluded under the Minnesota Rules of Evidence, a defendant must 'timely object[]' and 'state[] the *specific ground* of objection.' " (citing Minn. R. Evid. 103(a)(1)).

Even if Heller is correct that section 634.20 applies to evidence the defense seeks to introduce to show that an alternative perpetrator may have committed the crime in question—an issue we do not resolve today—the error is not plain. An error is plain if it is "clear or obvious," *State v. Vance*, 734 N.W.2d 650, 658 (Minn. 2007) (citation omitted) (internal quotation marks omitted), meaning the error "contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006).

We have not found authority applying Minn. Stat. § 634.20 in the alternative-perpetrator context. We also find no authority applying our common law to require the admission of relationship evidence that is otherwise not admissible as character evidence in the alternative-perpetrator context. *Boyce*, the case cited by Heller, involved the admissibility of evidence about the fraught relationship between *the defendant* and the murder victim. *Boyce,* 170 N.W.2d at 115; *see also State v. Rediker*, 8 N.W.2d 527 (Minn. 1943) (assessing evidence about the relationship between the defendant and the victim). Moreover, the language used in both section 634.20 and *Boyce*, "accused," does not plainly demonstrate that evidence of an alternative perpetrator's relationship with the victim is excepted from *Spreigl* or Rule 404(b). As the error is not plain, we do not reverse the district court.

27

Well, the opportunity doesn't seem to be established by the prior slaps, because everyone acknowledges [J.R.] was there the night before she died on the night—and the morning when she died. So I don't see how the slaps establish opportunity on this occasion. It doesn't really add to it. The opportunity is—it doesn't establish that.

As far as motive, it doesn't seem to establish any of those. It seems pretty, to be honest—not to cast aspersions, but it seems pretty clear that it's 404(a) [character evidence]. This is—he's a guy who slaps Lacy Krube around, and so he probably did it again, character trait, acting in conformity therewith.

In response, Heller's lawyer did not contest that the evidence tended to prove that J.R. was the kind of person who would kill Lacy and did not identify any other legitimate purpose for the evidence. Nonetheless, he argued that it had probative value to prove J.R. may have been the one to kill Lacy which outweighed any prejudicial impact the evidence may have had. The problem with the argument, however, is that the prior bad act evidence is simply not admissible to support an alternative-perpetrator defense (just as such evidence would not be admissible to prove a defendant committed a murder) if the only thing it proves is a propensity to commit the type of act for which the defendant is on trial. *See* Minn. R. Evid. 404(b)(1).

We conclude that the district court did not abuse its discretion in excluding the evidence. We agree with the district court that J.R.'s admission to police that he had slapped Lacy multiple times in the past is not relevant to prove opportunity and motive. Further, we have very little detail about when J.R. slapped Lacy, the circumstances under which it occurred, and the force with which it occurred. Lacy died as a result of serious harm to her stomach, harm that could not be inflicted by a slap. Thus, the prior instances of slapping are also not sufficient to prove method of operation.

28

B.

Heller also argues the district court erred in excluding evidence of an order barring J.R. from being in the house where his mother and brothers lived—the house where Lacy died—because he had previously assaulted those family members. Few details regarding the basis or content of the protection order are on the record because the order itself was never submitted to the court. Heller's counsel describes the order as both a "no contact order" and an "order for protection" at different points in the record. Heller claimed the order was issued because J.R. assaulted his mother and brothers but did not give further details on the nature of the assault, nor did he disclose whether the assault involved physical contact or harm.

Evidence of prior bad acts is not admissible to show that a person acted in conformity therewith on a different occasion and, even if the prior bad acts evidence is admissible for a legitimate purpose, it may be excluded if the prejudicial impact of the evidence outweighs its probative value. Minn. R. Evid. 404(b)(1), (b)(2).[10] The district court initially concluded that the evidence was not relevant because it showed only that J.R. potentially assaulted people other than Lacy.[11]

---

[10] Heller's lawyer agreed at trial that he was not seeking admission of the order for protection evidence under section 634.20. Accordingly, to the extent that Heller is arguing on appeal that the evidence should have been admitted under that statute, we review the refusal to admit the evidence for plain error. For the reasons set forth in *supra* note 9, the error (if it is error) was not plain.

[11] The district court expressed some concern that the orders for protection meant that J.R. was breaking the law by being in the house the night that Lacy died, a wrinkle that made admission of the evidence more complicated and potentially prejudicial to the State. During direct examination by the State, J.R. admitted that he was not supposed to be at his

29

After the initial ruling by the district court, the State called a "spark of life" witness.[12] Near the end of the witness's testimony, the following exchange occurred:

> Q. And did you ever know about [Lacy's] relationship with [J.R.]?
> A. Yes, I did.
> Q. And what did you know about her relationship with [J.R.]?
> A. I knew that he was an outstanding guy. He cared a lot about Lacy. Lacy and J.R. also had a child together.

Heller did not object to the testimony nor cross-examine the witness about Lacy's relationship with J.R.

Following that testimony, however, Heller claimed that he was entitled to introduce the protection order prohibiting J.R. from the house where Lacy died as character evidence in order to rebut the portrayal of J.R. as "an outstanding guy." The district court was not convinced, reasoning once again that the brief testimony did not change the prior conclusion that the potential prejudicial impact of the evidence outweighed the limited probative value of evidence of violent behavior against others or the nature of the relationship between J.R. and Lacy. We agree and find no abuse of discretion.[13]

_____

family's home on the night of Lacy's death, but that he had been living there for some time with his mother's permission.

[12] "Spark of life" evidence consists of biographical testimony about the victim to show that "[t]he victim was not just bones and sinews covered with flesh, but was imbued with the spark of life." *State v. Smith*, 876 N.W.2d 310, 325–26 (Minn. 2016) (quoting *State v. Graham*, 371 N.W.2d 204, 207 (Minn. 1985)).

[13] Heller's request that the district court reconsider its earlier ruling excluding the protection order evidence occurred after the district court initially ruled that Heller could introduce J.R.'s statements to police that he slapped Lacy on multiple occasions and before the district court reversed its ruling on that issue. Due to that timing, the district court also observed, when denying Heller's request for reconsideration of the ruling excluding the protection order evidence, that Heller could challenge the spark-of-life witness's

## C.

Finally, Heller claims that the district court should have admitted Lacy's statement to Heller's brother's fiancée that Lacy received a black eye from J.R. According to the fiancée, Lacy made the statement when Lacy moved in with Heller at Heller's brother's home in the weeks before her death.

The fiancée's statement about what Lacy told her is hearsay. Nonetheless, Heller sought admission of the statement under the residual hearsay exception set forth in Minn. R. Evid. 807.

Under Minnesota Rule of Evidence 807, hearsay statements that do not fall within one of the express hearsay exceptions set forth in Minn. R. Evid. 803 and 804 may still be admissible if the statement has "equivalent circumstantial guarantees of trustworthiness." Minn. R. Evid. 807. We consider the "the totality of the circumstances surrounding the making of the statements" to assess whether it is "particularly likely that *the declarant* was telling the truth at the time of making the statements." *State v. Lanam*, 459 N.W.2d 656, 661 (Minn. 1990) (emphasis added) (citation omitted) (internal quotation marks omitted). In addition, even if the hearsay statement has circumstantial guarantees of trustworthiness, the statement is only admissible if the district court also finds that

> (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the

---

description of the relationship between Lacy and J.R. by asking J.R. on cross-examination about his admissions to police that he had slapped Lacy multiple times. This order of events does not change our conclusion that the district court did not abuse its discretion in excluding the admissions about slapping. The evidence remains inadmissible for the reasons stated in Part V.A.

general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Minn. R. Evid. 807.

The district court ultimately ruled that the statement was inadmissible because it lacked guarantees of trustworthiness, reasoning that:

> I think we focused mostly on—most of the case law, to be honest, focuses on—as [Defense Counsel] did, on the reliability of the declarant [Lacy]. But I think it defies logic to say that we consider the totality of the circumstances, but we don't consider the reliability of whether the statement was even made or is it being made up out of whole cloth. And so I think when we talk about the totality of the circumstances, it has to include an evaluation of whether there is indicia of reliability for the statement even being made . . . . I don't see any guarantees of trustworthiness that the statement was even being made. And accordingly, it will not be allowed.

In other words, the district court excluded the evidence because it found that *the fiancée* was not a credible witness. That determination was based on the fiancée's potential bias interest in exonerating Heller and the fact that the fiancée did not reveal Lacy's claim that J.R. gave her a black eye until shortly before trial, nor did she refer to Lacy's claim in any previous statement to law enforcement or to the court.[14] The district court did not base its

---

[14] Heller claims that the only reason the fiancée's statement was not accounted for sooner is because the State's attorney blocked her from revealing Lacy's statement to the grand jury while she was testifying. The grand jury transcript, however, is not in the record. The only description we have of the grand jury transcript is that given by counsel during trial, and it is unclear from that description whether the fiancée would have said that Lacy told her J.R. gave her a black eye. Further, the record does not show the fiancée told police about the disputed hearsay statement. No transcripts of the fiancée's police interviews were submitted to the record. Although Heller claims in his brief that the fiancée told police Lacy blamed J.R. for her black eye, at trial Heller's counsel conceded there was nothing in the police reports to show that the fiancée had told that to police.

32

decision on the trustworthiness of Lacy's alleged statement, but rather, the trustworthiness of the fiancée's assertion that any statement was made at all.[15]

Heller argues that the district court erred in considering the credibility of the fiancée in conducting its trustworthiness analysis under Rule 807 and we agree. The proper focus of the Rule 807 analysis is whether the statement of the declarant—Lacy—is trustworthy. The credibility of the witness describing the declarant's out-of-court statement—the fiancée—can be tested at trial through cross-examination.

In *Dobbins v. State*, 845 N.W.2d 148, 154 (Minn. 2013), we addressed the question of admissibility of hearsay evidence under Rule 804(b)(3), which provides that hearsay statements are admissible if the declarant's statement

> was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Minn. R. Evid. 804(b)(3). In that context, we held that "the focus of the Rule 804(b)(3) inquiry is on the reliability of the declarant's out-of-court statement, not the credibility of the witnesses who recount the statement." *Dobbins*, 845 N.W.2d at 154 (citing, among other cases, *United States v. Katsougrakis*, 715 F.2d 769, 777 (2d Cir. 1983) ("[W]hile the

---

[15]    Heller aptly notes that the district court and prosecutor adopted the opposite approach when Heller objected to testimony from J.R. that Lacy told him Heller was the source of Lacy's injuries. The district court allowed the testimony noting that "[t]here's a difference between reliability of her statement to some degree and whether or not what he's saying is true." And the prosecutor said that "the evaluation of the statement is whether the statement itself has inherent indicia of reliability, not whether the person through whom we hear this statement might be reliable or have a bias or even a self-interest."

hearsay declarant is, and necessarily must be, unavailable to testify, the in-court witness takes the stand and is subject to cross-examination.")).

The same logic applies under Rule 807. Indeed, federal courts applying Fed. R. Evid. 807, from which Minnesota's Rule 807 is taken, *see* Minn. R. Evid. 807 comm. cmt.—2006, nearly uniformly hold that "[o]ne factor that should not be considered in evaluating the trustworthiness of the statement is the credibility of the person testifying to having heard it." 2 *McCormick on Evidence* § 324 at 564–65 (7th ed. 2013); *see also id.* at 565 n.23 (collecting cases). As explained in *Huff v. White Motor Co.*:

> [T]he reliability of the witness' testimony that the hearsay statement was in fact made is not a factor to be considered in deciding its admissibility. . . . Th[e] guarantees [of trustworthiness] relate solely to the trustworthiness of the hearsay statement itself. The specific exceptions to the hearsay rule are not justified by any circumstantial guarantee that the witness who reports the statement will do so accurately and truthfully. That witness can be cross-examined and his credibility thus tested in the same way as that of any other witness. It is the hearsay declarant, not the witness who reports the hearsay, who cannot be cross-examined.

609 F.2d 286, 293 (7th Cir. 1979) (citation omitted).

The State argues for a different rule based on our decision in *State v. Martinez*, 725 N.W.2d 733 (Minn. 2007). In *Martinez*, the defendant was tried for first-degree premeditated murder. During the trial:

> [T]he state called [the accomplice] to testify. [The accomplice] had reached a plea agreement with the state. Pursuant to that agreement, [the accomplice] pleaded guilty to a reduced charge . . . . The agreement required [the accomplice] to testify at the trials of [a second accomplice] and [the defendant]. [The accomplice] complied with the plea agreement and testified at the trial of [the second accomplice]. However, when called to testify at [the defendant]'s trial, [the accomplice] refused to testify . . . , explaining that living in prison as a snitch was worse than the possibility of a longer sentence for refusing to testify. Based on [the accomplice]'s refusal to

34

testify, the state offered [his] testimony from the [second accomplice's] trial as substantive evidence under [Rule 807] . . . .[16]

*Id.* at 736.

We held that the district court did not abuse its discretion in admitting the accomplice's trial testimony under Rule 807. *Id.* at 738. In our analysis, we observed that there was not "any doubt about whether [the accomplice] made the statement or what it contained." *Id.* The State points to that statement and argues that here, in contrast, Heller is asking the district court to "presume" without any evidence that Lacy ever made the statement to the fiancée. The problem with the State's argument is that the district court did not have to make such a presumption: the fiancée herself stated that Lacy told her that J.R. gave Lacy a black eye. There may be reasons to doubt whether Lacy ever made the statement to the fiancée, but the State could have raised all those doubts by cross-examining the fiancée. In short, the question of whether, as the fiancée claimed, Lacy had actually made a statement to her, is not a reason to find the substance of Lacy's statement that J.R. gave her a black eye untrustworthy for purposes of Rule 807.

Even though the district court erred in assessing the trustworthiness of the fiancée's statement under the totality of the circumstances test, we nonetheless conclude the evidence is inadmissible under the reverse-*Spreigl* test. *See also* Minn. R. Evid. 404(b)(2).

As noted above, evidence of prior bad acts—even if offered for a legitimate purpose other than proving a person's propensity to act in conformance with those prior bad

---

[16]    At the time, the catch-all exception language included today in Rule 807 was found in Minn. R. Evid. 803(24) (2004).

acts—is not admissible unless the prior bad act is proven by clear and convincing evidence. Minn. R. Evid. 404(b)(2). Evidence is clear and convincing when "the truth of the facts asserted is highly probable." *State v. Jones*, 753 N.W.2d 677, 696 (Minn. 2008) (citation omitted) (internal quotation marks omitted). The district court reviewed the record—including the facts that (1) the fiancée's recollection of her conversation with Lacy about the black eye arose soon before trial, (2) there was no reference to such a conversation in the fiancée's earlier statements, and (3) the conversation was not corroborated by other evidence in the record—and concluded that it did not "see any guarantees of trustworthiness that the statement was even being made." Although not stated directly, the district court determined that the truth of the fiancée's statement that Lacy told her that J.R. gave her a black eye was not highly probable. We have reviewed the record and agree. Consequently, the prior bad act evidence concerning the infliction of a black eye was not admissible and the district court did not abuse its discretion in excluding it.

D.

Heller also argues that even if the district court's decisions to exclude the fiancée's hearsay statement, the evidence that J.R. previously slapped Lacy, and the fact that protection orders had been issued against J.R. were proper under the Minnesota Rules of Evidence, the exclusion of the evidence nonetheless violated Heller's right to a fair trial—particularly, the right of an accused to present witnesses in his own defense. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (reversing the exclusion of alternative-perpetrator evidence when the district court applied the state rule of evidence on hearsay

36

mechanistically to defeat the ends of justice by excluding testimony that bore persuasive assurances of trustworthiness that fell well within the basic rationale of the exception for declarations against interest). We disagree.

The United States Supreme Court and we have both recognized that in exercising the right to present witnesses, a defendant must comply with rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. *Id.*; *State v. Guzman*, 892 N.W.2d 801, 811 (Minn. 2017). The reasons the three pieces of alternative-perpetrator evidence were excluded in this case—that the evidence was pure propensity evidence, that the prejudicial impact of the evidence outweighed its probative value, and that the evidence was unreliable under the applicable level of proof—all serve to assure fairness and reliability in the ascertainment of guilt in evidence, particularly under the circumstances of this case. In addition, the application of the rules of evidence in this case was neither arbitrary nor disproportionate to the purposes the rules were designed to serve. *Holmes v. South Carolina*, 547 U.S. 319, 324–25 (2006).

\* \* \*

We ultimately hold that the district court did not commit any reversible error. First, any error in the district court's venue jury instruction was harmless beyond a reasonable doubt. Second, the district court did not err in instructing the jury that it could convict Heller of domestic abuse murder if Heller had engaged in a past pattern of abuse against "[Lacy] and/or other persons who qualify as defendant's family or household members" because singular acts of violence against multiple different persons is sufficient to establish a pattern of domestic abuse under Minn. Stat. § 609.185(a)(6). Third, the evidence of

37

Heller abusing J.L. is admissible because it was connected to a consistent and proximately temporal pattern of abusing family and household members that showed it was Heller's "regular way of acting." Fourth, while the officer's expert testimony on lethality factors was inadmissible profile evidence, it was presented in such a limited manner that there is no reasonable possibility that the evidence had a significant impact on the jury's verdict, so allowing the testimony was not reversible error. Fifth, the district court did not abuse its discretion in refusing to admit evidence of J.R.'s prior abuse of Lacy. And under the circumstances of this case, the state rules of evidence that support the exclusion of the evidence of J.R's prior abuse of Lacy all serve to assure fairness and reliability in the ascertainment of guilt in evidence.

## CONCLUSION

For the foregoing reasons, we affirm the district court.

Affirmed.


HENNESY, GAÏTAS, JJ., not having been members of this court at the time of submission, took no part in the consideration or decision of this case.